### THE STATE v. H. J. WARREN, Appellant.

**Division Two, February 7, 1911.**

1. **RAPE: Insane Woman: Information.** An information charging that defendant upon a certain "female, unlawfully, violently and feloniously did make an assault, and her; the said . . , then and there unlawfully, forcibly and against her will, feloniously did ravish and carnally know," sufficiently charges the crime of rape upon an insane married woman.

2. ———: ———: **Defendant's Knowledge: Sufficient Evidence of His Guilt.** The evidence in this case was sufficient to support a finding that prosecutrix was so mentally deranged as to be incapable of understanding the moral nature of the sexual act, or of giving assent thereto. But to sustain the conviction there must be some evidence tending to show that defendant knew of this mental infirmity of prosecutrix and took advantage of it, or that he intended to have carnal knowledge of her body

by force, if necessary, and regardless of her consent. And in this case there is no substantial evidence tending to support either proposition.

3. ———: ———: **When Carnal Knowledge is Rape.** Carnal knowledge with a woman incapable, from mental infirmity, of giving consent, is rape, unless the man is ignorant of her infirmity and its extent, believes he has her consent, and has no intention of having intercourse without her consent.

4. ———: ———: **Burden on State to Show Her Insanity and His Knowledge.** Where a woman yields an apparent assent to the act of sexual intercourse, the burden is on the State to prove that at the time of the act she was incapable, because of mental disease, of assenting to or dissenting from the act, and that the defendant knew of such incapacity.

5. ———: ———: **Evidence of Insanity: Defendant's Knowledge.** Testimony showing prosecutrix's upright family history, her virtuous character and good name, and her erratic and insane condition a few hours after the alleged sexual offense, may satisfy the jury that she did not at the time of the act comprehend its moral nature, and hence could not give her assent. But if none of these things were known by defendant, and he could only judge of her mental condition from her manner and conversation at the time of the act, and there is no proof tending to show that at that time she was so mentally disturbed as to be incapable of consenting to the sexual act, and what defendant did was with her apparent assent and approval, there can be no conviction.

7. ———: ———: **Degree of Insanity: Instruction.** An instruction which tells the jury that "before you will be warranted in finding the defendant guilty of rape, . . you must believe from the evidence, beyond a reasonable doubt, that the defendant had sexual intercourse" with prosecutrix, that at the time she was insane, and "that her insanity was of such a character as to be readily recognized by a person of ordinary intelligence in conversation with her," is erroneous, for two reasons: first, mere insanity, even if known, does not make the act rape; it must totally destroy the capacity to consent; and, second, the defendant must know that there is no capacity to consent; this knowledge may be inferred from facts and circumstances in evidence, but the jury must find as an ultimate fact that defendant did know.

Appeal from Newton Circuit Court.—*Hon. F. C. Johnston,* Judge.

REVERSED AND REMANDED.

*Geo. R. Clay* and *R. H. Davis* for appellant.

(1)   An indictment or information against a defendant must contain an allegation of every substantive fact which the State is required to prove in order to secure a conviction.   State v. Murphy, 141 Mo. 270; State v. Green, 111 Mo. 585; State v. Reed, 117 Mo. 604; State v. Evans, 128 Mo. 406; State v. Blan, 69 Mo. 317.   (2)   It devolves upon the State to prove beyond a reasonable doubt that the alleged injured party was so mentally deranged that she could not, at the time of the sexual act, give her consent.   (3)   Also to prove that defendant knew he had not her consent to the sexual act.   2 Bishop, Cr. Law (8 Ed.), secs. 1121, 1123; State v. Cunningham, 111 Mo. 382.   (4)   A judgment of conviction will not be permitted to stand when there is no other proof of the corpus delicti than the uncorroborated extra-judicial confession of the accused.   1 Bishop on Cr. Proc., sec. 1058; State v. Gorman, 54 Mo. 526.   (5)   Instructions 1 and 2 do not properly declare the law.   2 Bishop, Cr. Law (8 Ed.), secs. 1121, 1123.   (6)   Instruction 8 is erroneous.

*Elliott W. Major,* Attorney-General, and *John M. Dawson,* Assistant Attorney-General, for the State.

(1)   Sexual intercourse with an unsound or idiotic woman whose mind, to the knowledge of the man, is totally incapable of consenting to the act, is rape, though she submits to the act without resistance, for in such a case the intercourse is without her consent and against her will.   23 Am. and Eng. Ency. Law, sec. 7, p. 856.   The mental condition of the woman is an important consideration in determining whether her submission is a matter of consent.   State v. Huff, 164 Mo. 480; State v. Farr, 28 Ia. 397; State v. McDonough, 104 Ia. 6; R. S. 1909, sec. 4471.   If a female is weak-minded and consents to the intercourse from animal

instincts or morbid desires, the act is not rape. People v. Crosswell, 13 Mich. 427; State v. Cunningham, 100 Mo. 382; Reg. v. Connolly, 26 U. C. Q. B. 317. Absence of consent may be shown by proving that the woman was the subject of mania or idiocy, or asleep, or in a state of stupefaction or unconsciousness, when the act of intercourse took place. 10 Cyc. Ev., p. 585, sec. 2. (2) The information is sufficient, valid and properly charges the offense. State v. Goodale, 210 Mo. 275; State v. Burries, 126 Mo. 565; State v. Dilts, 191 Mo. 665. (3) The authorities hold to the rule: First. That if she was incapable of expressing consent or dissent, or of exercising any judgment upon the matter from imbecility of mind or defect of understanding, then appellant would be guilty. State v. Williams, 149 Mo. 496; Reg. v. Fletcher, 8 Cox 131; Reg. v. Ryan, 2 Cox 115; Wharton on Crim. Law (9 Ed.), sec. 560; People v. Griffin, 117 Cal. 585. Second. If the mind of the insane or idiotic woman was incapable of consenting to the act, though she submits to the act without resistance, the man must have knowledge of the condition of the mind of the woman at the time. Crosswell v. People, 13 Mich. 427; Reg. v. Connolly, 26 U. C. Q. B. 317. Resistance on the part of the female is not essential. State v. Tarr, 28 Ia. 397.

FERRISS, J.—The defendant was convicted in the circuit court of Newton county of the crime of rape alleged to have been committed November 7, 1909, upon the person of Narcissa Foster, a married woman, and his punishment fixed at six years in the penitentiary. The trial proceeded upon the following information:

"Now comes Albert D. Bennett, prosecuting attorney within and for the county of Newton, State of Missouri, under his oath of office and upon his information and belief informs the court, and presents and charges to the court, that H. J. Warren, on the 7th day

of November, A. D. 1909, at the county of Newton and State of Missouri, in and upon one Narcissa Isabella Foster, a female, unlawfully, violently and feloniously did make an assault, and her, the said Narcissa Isabella Foster, then and there unlawfully, forcibly and against her will, feloniously did ravish and carnally know, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State.''

The evidence for the State preserved in the record shows that at the time of the trial, in March, 1910, the prosecutrix was nineteen years old, had been married over two years, had been in an insane asylum once before she was married and once afterwards, three or four months at a time, the last time being six or eight months prior to the alleged rape. Her mind, according to her husband's testimony, ''has been fairly well since we were married.'' The maternal grandmother and one maternal aunt were in the asylum at the time of the trial, and had been there twelve years. The following question was asked of her father: ''I will ask you what has been her mental condition?'' A. ''Well, it has been bad. I believe this is the third time she has been this way.'' Also, Q. ''And she was discharged as cured by the asylum authorities?'' A. ''I suppose so.''

Prosecutrix had had no children. On November 3, 1909, prosecutrix paid a visit to the home of her parents, whom she had not seen for a year and a half, going there by train alone. When she left her husband on this occasion there was nothing unusual in her condition. She was talking a good deal about going home. She stayed at her father's house Thursday, Friday and Saturday, and was in a normal condition during this time, save that on Saturday, when she left to meet her husband, as she claimed, at Neosho, ''she seemed a little bit restless.'' During this visit she seemed to be

in average health. There had not been anything unusual in the letters which she frequently wrote home, except that her last letters showed nervousness in the handwriting. On the last night of her visit she seemed a little restless, and wanted to sit up and talk, but there was nothing unusual in her manner of conversation. Her father and mother drove her to the railway station in a buggy on Saturday, November 6th, bought her a ticket to Neosho, and put her on the train which left the station at 5 p. m., and she made the journey alone. On November 3d the husband left his wife at home, and went to Mosely Mines, it being then understood that she was to visit at her father's until the Saturday following. The train was due at Neosho about 12:30 Sunday morning, November 7th. Whether the train was late does not appear. At about 2 o'clock that morning the prosecutrix appeared at the Central Hotel, in Neosho, with the defendant, who registered his own name. The proprietor, J. B. Loher, asked him, "Is this your wife?" He answered, "Yes." Then, at Loher's request, defendant added to his name the words "and wife." Upon it being stated that he registered from Springfield, the woman said, "I am not from there," or something of that kind. The defendant told her, "That is all right." The following testimony, in addition to the above, was given by Loher:

"Q. What was her actions at that time? A. Well, she was talking pretty loud when she came in; kept talking loud along. I was rather under the impression she was full of dope of some kind, cocaine, or something of that kind, the way she was talking. Q. Did the defendant talk much? A. No, he didn't have much to say. Q. How did she talk, as to whether she was talking loud or low? A. She talked loud. Q. State whether or not she was talking rapidly or slowly? A. She was talking pretty rapidly. Q. Then, what did you do after they registered? A. I took them to

room number eight. Q. State whether or not they both went in the room? A. Yes, sir. Q. How many beds in that room? A. Just one. Q. You may state to the jury what happened, if anything that you knew about, whether or not as to the noise? A. I was down stairs, and I could hear them talking, especially her. I could not hear him very much. Once in a while I could hear him say something, but could not distinguish what they were saying. They kept it up all the time; and about six o'clock in the morning, they kept it up so, I was upstairs, and I didn't know that she had gone out of the room, but she came running upstairs. She had got out, and went down stairs, and I think went to a drug store. She came back and went to the room. I followed them right to the room, and opened the door, and he was in bed. I told him I wanted him to get up and pay his bill, and get out of there; that he was creating too much disturbance. He said he would get up after a bit. I said, 'You will get up right now; I will stay right here until you get up and pay your bill and get out of here.' So he got up. Q. Was there any bed made down, or anything? A. No, sir.''

At the time they left the hotel, Loher says, ''she was talking wild all the time. I can't remember what she did say; she was talking loud.''

There was no other material testimony in chief of eye-witnesses introduced by the State as to the conduct or conversation of prosecutrix prior to six o'clock, Sunday morning, November 7th.

The State's testimony in chief showed further that on Sunday, the 7th, at eight or nine o'clock, the prosecutrix was found wandering on the streets of Neosho in a state of mental aberration. The sheriff testified that she told him of being robbed on the train, and that he thought her crazy; that he sent for the city marshal, and, upon what she and others said, arrested

defendant and put him in jail; that she talked wildly, saying her husband was a fugitive from justice and a deserter from the army, and that his brother killed a man. He could not remember all she said.

Johns Williams testified that he met her on the street. She was walking along, talking or making some kind of a noise, and stated to him that she was hunting for something to eat. She said she had money, and showed him a quarter, and then said, "I don't want to talk to you at all. I have already laid my case before the detectives, and the detectives are working on it." The witness thought she was crazy.

B. J. Perriman, city marshal, testified he saw prosecutrix on the street, and a crowd there laughing and amusing themselves at her talk. She was "talking kind of 'bug-housey,' I would call it." She denied to this witness that the defendant had had intercourse with her.

A. J. Thomas, deputy sheriff, testified as follows:
"Q. I will ask you if you saw Mrs. Foster? A. The first time I seen her was that Sunday, down at a house on the corner of Kohler and Mill street. Q. What was she doing? A. She was laying down the first time I seen her. Q. Where was she lying? A. On the little porch. Q. Was anyone living there? A. Yes, sir, some people lived there at that time. Q. What time of day was that? A. I am not sure, but I think in the morning—just a while before noon. Q. Did you talk any with her? A. Yes, sir. Q. While she was lying there? A. Yes, sir. Q. State what her attitude was—her condition, so far as you can describe it? A. She seemed to be in a very distressing condition mentally and physically, both. She said she had been robbed. Somebody had taken, her statement was, over four dollars from her. And I asked her who it was done it, and she said she didn't know, but she said she thought it was the Parker boys.

I said, 'Where are the Parker boys?' She says, 'They live out in the country somewhere.' Then she said somebody gave her some money. She said her father gave her some money. I asked her how much he gave her, and she said $4.50, I believe it was. I asked her if they taken it all, and she said, I think, they taken $3.50; and I talked with her quite a while, and went to a lady's house and brung her some water. She complained about being thirsty, and I rather thought at the time that she had taken dope, cocaine, or something of that kind; and I told one or two parties there at the time I thought that was what was the matter with her; and I asked her if there was any arrangements made to get her out to where she wanted to go. She told me she wanted to go out to her brother-in-law's, George Brand's.''

The prosecutrix was examined by two physicians on Sunday and Monday. Each testified that, in his opinion, judging from her talk and appearance, she was crazy. One doctor who examined her on Sunday, called it, according to the transcript, "maniacal or delusive" insanity. He said that she had fever, which he suspected was typhoid, and that such disease is sometimes accompanied by mental derangement. In his opinion, prosecutrix did not have sufficient intelligence to comprehend and consent to sexual intercourse. This question was asked him: "From the condition you observed on Sunday, and from your experience as a physician and in your opinion, what would you say as to her condition on Saturday prior to that?" Answer: "In my opinion it was not materially different from the condition Sunday or Monday." He further testified that he thought her condition would impress an average layman, who talked with her, with the idea that she was insane. Q. "You are not prepared to say that, twenty-four hours pre-

vious, or ten or twelve hours previous, her condition was of the kind you have described?" A. "No, sir, I could not say it was."

Doctor Roseberry, county physician, who examined the prosecutrix on Monday, November 8th, testified that she was insane at that time, and was apparently suffering from "the maniacal form of delusional insanity, where all the mental activities are excited." He testified that she talked about being robbed, and said that her husband was a fugitive from justice. Witness thought she might consent to sexual intercourse, but he didn't think she would realize what she was doing, or have a conception of the moral wrong. He stated that he knew nothing of her condition on Saturday save by inference. (The witness did not state what the inference would be.)

The prosecutrix, after submitting to the examinations above referred to, was removed to an insane asylum, and did not testify in this case.

Several witnesses for the State testified that the defendant admitted that he had intercourse with the prosecutrix at the hotel, but that he also said at the same time that he did not think she was crazy. One of the State's witnesses testified that the defendant, in this conversation, denied having had intercourse with the prosecutrix.

The evidence shows that this unfortunate woman was a church member, and possessed an unblemished character.

At the close of the case for the State the defendant asked the court to instruct the jury that under the law and the evidence they should find the defendant not guilty. The request was refused, defendant excepting to the court's ruling.

For the defense, Ivey Ritchey, a girl employed in the hotel, testified the following:

"Q. What room of that hotel did you occupy? A.

Number twelve. Q. Is number twelve and number eight adjoining rooms? A. No, my room was across the hall. Q. Was you in a position that night that you could know or hear, and know the actions of this defendant, Warren, and Mrs. Foster? A. No, I could not see them, but I could hear them. Q. Did you see them at any time? A. Yes, sir. Q. Tell the jury how you saw them? A. I was passing the door as I went down to work, and the door was open and I saw them. Q. What were the positions of those parties on that night? A. He was sitting on the side of the bed, and she was standing before the mirror. Q. Later on did you see her again? A. Yes, sir; about six o'clock in the morning I saw her. Q. What was her position at that time? A. She was in the office, wanting to know the way to a drug store. Q. Did you see her at any time when she was in room number eight that evening, with a pillow, lying on the floor? A. No, she was standing before the mirror. Q. What, if anything, do you know, either from their conversation or their actions, about the defendant having intercourse with Mrs. Foster that night? A. In my opinion, she would not let him. Q. Did you hear a conversation there? A. Yes, sir. Q. Tell the jury what that conversation was. A. She wanted him to go to Springfield, and they would get married. She was a married lady, I heard, and she wanted him to go to Springfield, and she would get a divorce and be married in a short time; and he, of course, said he didn't want to, and said that he didn't have means to support a wife, and he didn't want to get married then anyway; and she said she would help him if he would go with her to Springfield; but he said he would not go; and that is about all, of course, that I heard."

This witness, on re-examination, testified: "Q. You saw this woman there in the office? A. Yes, sir. Q. And saw her in her room? A. Yes, sir. Q. And

heard her conversation there? A. Yes, sir. Q. I will ask you if you saw anything that indicated that she was insane? A. No.''

When the prosecutrix reached Neosho, Sunday morning, according to the testimony for defendant, she met at the station the defendant, who up to that time was an entire stranger to her; also some other men. One of these, Fred Huddleston, testified for defendant as follows:

"Q. Are you acquainted with Mr. Warren? A. Yes, sir. Q. Was you acquainted with him on the 6th day of November, 1909? A. Yes, sir. Q. What business was he engaged in at that time? A. He wasn't doing anything then. Q. What had he been engaged in? A. He had been operator at the Frisco. Q. Do you remember the occasion of this Mrs. Foster coming in on the train? A. Yes, sir. Q. You saw her that night? A. Yes, sir. Q. And saw Warren? A. Yes, sir. Q. State to the jury whether there was anything in the demeanor of Mrs. Foster over there at the station, or elsewhere, that indicated to you that she was insane? A. No, sir, there was not.'' On cross-examination, the witness testified: "Q. Now, then, you remember her coming in? A. Yes, sir. Q. Did she ride on the bus? A. No, sir. Q. What did she do? A. Went into the depot. Q. Did you talk with this woman any? A. A little, yes, sir. I asked her if she wanted to ride up town. She said no; she wanted to go to the Mosely Mines. Q. That is all the conversation you had or heard her say? A. Yes, sir.''

Henry McKnight, another witness for defendant, testified: "Q. I will ask you if you met this Mrs. Foster on Saturday night, November the 6th? A. Yes, sir, Q. I will ask you if you talked with her? A. Yes, sir, I did. Q. I will ask you to state to the jury if you saw anything in her conduct or in her conversation that would indicate to you that she was crazy?

A. There was not.   Q. Tell what she said and did.
A. She asked me if I knew where Mosely Mines were.
I told her I did, and she wanted to go out to Mosely
Mines, and wanted to know how far it was out there.
I don't remember just what all she did say now. She
never said anything that I would take her to be in-
sane, or anything like that.   Q. Didn't she want you
to take her out to Mosely.?   A. Yes, sir.   Q. I will
ask you if you didn't get a rig for that purpose?   A.
No, sir.   Q. I will ask you if you didn't make arrange-
ments to take her out there?   A. I did make arrange-
ments.   Q. That was at her request?   A. Yes, sir."
On cross-examination, the witness thus testified: "Q.
That was done at the station there?   A. Yes, sir.
Q. Was you one of the two boys there that the con-
ductor told to let her alone, that she was crazy?   A.
No, sir.   Q. Did you see her when she first got off?
A. No, sir.   Q. You are not in the livery business?
A. No, sir.   Q. And you was going to take her out—
hire a livery rig and take her out?   A. Yes, sir.   Q.
Why didn't you take her?   A. The other fellows beat
us to it.   Q. Who was going to help you?   A. A fel-
low named Smith was going with me.   Q. Is that the
Smith that just got off the stand here?   A. I don't
know.   Q. A dark-complexioned fellow?   A. A fel-
low that works on the train, cooks; he was at that
time cooking on a dining car.   Q. He was going to
help you take her out, and still neither of you were in
the livery business. You can stand aside."

Another witness, Clarence Smith, who came in on
the same train with the prosecutrix, testified for de-
fendant: "Q. What was her mental condition at that
time—did you observe anything that would indicate to
you that she was insane?   A. She seemed like a very
sensible woman to me.   She didn't seem crazy to me.
Q. There was nothing in her demeanor or conduct
that would indicate that she was insane?   A. No, sir."

On cross-examination, he thus testified: ''Q. Isn't it a fact she was talking very loudly and buying a lapful of oranges? A. I came to notice her; it was between Granby and Neosho, and she had a basket, and I was walking back through the car, and sat down. Q. By her? A. No, sir. And she began to say that somebody had stole her stuff what she had to eat. Q. Did you think somebody had? A. I didn't know. Q. So she was saying right on the train, where there was a good many people, that somebody was stealing what she had to eat, and you think she was sane? A. That is all I heard her say. Q. You are basing your opinion on what she said right there on the train where all these people was, and on that you are basing your opinion that she was sane? A. Yes, sir.''

The defendant testified that he never saw the woman before that night at the station, and that he took her to the hotel at her request ''to take her up there to a room.'' He admitted that he stayed with her in the room from 2:30 a. m., to 6 a. m., but denied having had intercourse with her.

J. B. Loher, called in rebuttal, testified: ''Q. Was there anything to indicate to you in her appearance that she was insane at the time she entered that room? A. Well, I didn't have any thought of her being insane. The way she was talking and acting I thought she had taken some kind of dope. Q. She didn't impress you as an insane person? A. I didn't give that a thought. Q. She didn't act rational? A. No, sir, she was talking very loud and fast. Q. And at the time you drove them out she still was not acting rational? A. I couldn't keep her still at all.''

The following instructions, among others, were given by the court:

''1. The court instructs the jury that if you find and believe from the evidence in this case, beyond a reasonable doubt, that the defendant, H. J. Warren,

at the county of Newton, State of Missouri, on or about the 7th day of November, 1909, did willfully and feloniously have sexual intercourse with one Narcissa Isabella Foster, and if you further believe and find from the evidence that at the time of such intercourse, if you believe it was had, the said Narcissa Isabella Foster was a person of unsound mind, and of such weak intellect and intelligence, that she could not and did not know or comprehend the nature and consequence of such an act, and could not understand right from wrong, you will find the defendant guilty of rape, and assess his punishment at death or imprisonment in the penitentiary for a term of not less than five years.

"8. You are further instructed that before you will be warranted in finding the defendant guilty of rape as charged in the information, you must believe from the evidence, beyond a reasonable doubt, that the defendant had sexual intercourse with Mrs. Foster; that at the time of such intercourse Mrs. Foster was insane, and that her insanity was of such a character as to be readily recognized by a person of ordinary intelligence in conversation with her, and unless you so believe from the evidence the State has proven these facts, you must acquit the defendant."

On this record the defendant complains, (1) that the complaint is defective in that it fails to allege all the substantive facts which the State is required to prove; (2) that the demurrer to the evidence should have been sustained; (3) that the court erred in giving instructions numbered 1 and 8, asked by the State. It will be unnecessary to notice other errors assigned.

*First*: We think the information sufficient in form and substance.

*Second*: The claim that the evidence for the State is insufficient to support the verdict demands serious consideration by reason of the importance of the questions involved. In view of the testimony as to the

prior good character of the prosecutrix, and the testimony concerning her condition on the day following the morning of November 7th, as well as that of her former mental condition and family history, there was ample evidence to support a finding that at the time of the alleged act of intercourse with defendant, Mrs. Foster was so mentally deranged as to be incapable of understanding the moral nature of the act, or of giving assent thereto. To sustain the conviction, however, the State must go further, and give some evidence tending to show that the defendant knew of and took advantage of this mental infirmity of the prosecutrix, or that he intended to have carnal knowledge of her body by force, if necessary, and regardless of her consent. As to the latter proposition, there is no evidence that such was his intent. All that the defendant did was with her apparent assent and approval. Whether there is any testimony from which knowledge of her incapacity to consent could be imputed to the defendant is a question not free from difficulty. Reason and authority suggest the following principles as guides in the solution of this question:

1. Carnal intercourse with a woman incapable from mental infirmity of giving consent, is rape, unless the man is ignorant of her infirmity and its extent, believes he has her consent, and has no intention to have intercourse without her consent.

2. Where the woman in point of fact yields an apparent assent to the act, the burden is on the State to prove that at the time of the act she was incapable, because of mental disease, of assenting to or dissenting from the act, and that the defendant knew of such incapacity.

The following citations from the authorities support and illustrate the principles announced above:

"Carnal intercourse with a woman incapable, from mental disease (whether that disease be idiocy

or mania), of giving consent, is rape.  But the question as to whether the mental disease is such as to incapacitate the patient from assenting is one to be examined with great care.  There are many persons laboring under mitigated insanity who are incapable of making contracts, but who in a modified degree are responsible for crime.  For a man knowingly to have intercourse with a woman of intellect thus impaired is no doubt peculiarly wrongful; yet if she be capable of consenting, and does consent, it is not rape.  And *a fortiori* is this the case when the man has no knowledge that the woman's intellect is disturbed.  Hence, in such cases, if there be consent, a prosecution for rape cannot be sustained."   [1 Whart. Crim. Law, sec. 560.]

Mr. Bishop, in volume 2, section 1121, of his work on Criminal Law, says:  "Where the idiocy is so profound as absolutely to incapacitate her to consent or dissent, the man who penetrates her, not supposing he has her consent, commits the crime."

In the case of State v. Tarr, 28 Iowa 397, the facts showed that the girl in the case was of weak mind; could not talk so as to be understood; was not capable of taking care of or even dressing herself, and had been idiotic since birth.  The court held that, although there was no proof that the defendant had prior knowledge of her condition, yet if she was so idiotic as not to be able to talk intelligibly, and if the defendant talked with her a while before the assault, the jury might infer knowledge on his part of her mental irresponsibility.  In this case the court lays down a rule as applicable to cases of this character, as follows: "The case before us falls rather within another class, where it is held, as we believe, without dissent, that if the man, knowing the woman to be insane (or idiotic), should take advantage of that fact to have knowledge of her person, while her mental powers were so im-

paired that she was unconscious of the nature of the act, or was not a willing participator, the act would be rape, though distinct proof of opposition might be wanting.''

In State v. Cunningham, 100 Mo. 382, l. c. 394, this court says: "To constitute rape, the act must be intended to be done with force and without the woman's consent, and if done with these intentional elements, it can make no difference that the woman was insane and that the accused did not know she was incapable of giving her consent. Unless this is so, an insane woman or an idiot is at a great disadvantage in the hands of a ravisher. But if the man does not know that the woman is *non compos,* and from her conduct is led to believe he has her consent, we do not see how the act can be rape.''

In the case of Regina v. Connolly, 26 U. C. Q. B. 317, the following charge was given to the jury: "That if upon the evidence they were satisfied that the woman was of unsound mind, that she had no moral perceptions of right or wrong, that her acts were not controlled by the will, were in fact involuntary, she could not be said to be capable of giving consent, because by reason of her state of mind incapable of judgment and discretion; and the yielding on her part to force ought not, in view of such impotence of her will (and knowledge of her state by defendant), to be taken as an act done with her will.''

In the case last cited the court states the mental condition of the woman thus: "She was a married woman, with children, and was found to have acted at various times in such a strange manner as to furnish strong evidence of hallucination and delusion, warranting the jury in finding her, in popular language, insane.''

Under the facts stated above, there is no evidence (aside from the question of insanity) that the

defendant intended to commit the act by force and without the consent of the prosecutrix. Therefore, in order to make a case, the record must show substantial evidence on the part of the State tending to prove that the prosecutrix was at the time incapable, by reason of insanity, of giving assent, and further, that defendant at the time knew of such incapacity. It would not be enough to show merely that she was weak-minded, and that the defendant knew that she was so. "The mere fact that a woman is weak-minded does not disable her from consenting to the act. . . . So long as the woman is capable of consenting, and does consent, the act is not rape, and this is true though the man may know that she is of weak intellect." [State v. Cunningham, supra, 1. c. 393.]

The real question is, assuming that the prosecutrix was so mentally infirm as to be incapable of giving assent, did the defendant, at the time, know of such incapacity? In answering this question, we are confined to the facts as they were apparent to the defendant at the time the act was committed. The testimony showing the family history of the prosecutrix, her virtuous character, and her condition on Sunday, after nine o'clock, might well satisfy the jury that the prosecutrix did not at the time of the act comprehend its moral nature, and could not give her assent. None of the facts shown by such testimony were known to defendant when the act was committed. He could only judge from the manner and conversation of the prosecutrix at the time of the act.

The State introduced no testimony, save that of one eye-witness, J. B. Loher, showing her *apparent* condition when prosecutrix retired to room 8. We are of the opinion that there is nothing in the testimony of Loher, the hotel proprietor, tending to prove that the prosecutrix was at that time so mentally disturbed as to be incapable of consenting to the sexual act. She

certainly did not produce that impression upon him. Upon his re-examination in rebuttal, he was asked this direct question: "Was there anything to indicate to you in her appearance that she was insane at the time she entered that room?" He answered: "Well, I didn't have any thought of her being insane. The way she was talking and acting I thought she had taken some kind of dope." The only peculiarity in her manner noticed by him was that "she was talking very loud and fast."

As to any inferences that may be drawn from the evidence of her prior and subsequent condition, such inferences, if considered at all as bearing upon defendant's knowledge of her condition at the time in question, are, if anything, favorable to the defendant.

It is clear that at five o'clock, on November 6th, when prosecutrix boarded the train, her condition was apparently normal. There was nothing in her manner at the time to suggest to her parents that she was not fit to travel alone. In view of the undoubted fact that her condition was apparently normal on Saturday, the opinion expressed by the physician who examined her Sunday night, that her condition on Saturday "was not materially different from the condition on Sunday and Monday," cannot have any force, especially as that opinion was much weakened in force on cross-examination. The testimony of the physicians introduced by the State affords no basis upon which it can be fairly said that a non-expert observer in the position of defendant could know that the prosecutrix was insane to the degree of total incapacity.

We feel constrained to hold that the trial court erred in not giving an instruction to acquit at the close of the State's case.

*Third*: It is obvious from the foregoing discussion that instruction numbered 8 was erroneous in that it told the jury that mere insanity of a character to be

recognized by a person of ordinary intelligence was enough to convict. There are two objections to this instruction. 1. Mere insanity, even if known, does not make the act rape. The insanity must totally destroy the capacity to consent. [State v. Cunningham, supra.] 2. The defendant must know that there is no capacity to consent. This knowledge may be inferred from facts and circumstances in evidence, but the jury must find as an ultimate fact that the defendant did know.

It follows from what has been said above that instruction number one should have been qualified by including, as an element of the crime, knowledge by the defendant of the mental condition of the prosecutrix defined in the instruction.

For the errors indicated, the judgment is reversed and the cause remanded. *Kennish, P. J.,* and *Brown, J.,* concur.