

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD87083** |
| | ) | |
| **V.** | ) | **OPINION FILED:** |
| | ) | **MAY 27, 2025** |
| **WILLIAM AARON THOMAS, JR.,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Boone County, Missouri**
The Honorable Jeff Harris, Judge

Before Division Two:  Cynthia L. Martin, Presiding Judge, Gary D. Witt, Judge and W. Douglas Thomson, Judge

William Aaron Thomas, Jr. ("Thomas") appeals his conviction of rape or attempted rape in the first degree in violation of section 566.030.[1]  Thomas alleges insufficient evidence was submitted to permit the jury to find beyond a reasonable doubt that his victim was incapable of consent, an essential element of his offense.  Finding no error, we affirm.

---

[1]All statutory references are to RSMo 2016 as supplemented as of January 1, 2017, unless otherwise noted.

**Factual and Procedural Background**

Viewed in the light most favorable to the jury's verdict,[2] the evidence established that in the early months of 2017, and continuing into July, 2017, J.B. ("Victim") was living with her biological mother ("Mother") and Thomas (who was not related to Victim) at the Welcome Inn hotel in Boone County, Missouri. Victim was fifteen years old at the time. Victim was born impaired by several medical conditions. Victim has club feet, wears hearing aids and glasses, is autistic, has diagnosed learning disorders, and suffers from cerebral palsy.

While living at the hotel, Victim initially had regular contact with the hotel manager. The hotel manager testified that Victim communicated at the level of a four-year-old. Victim told the hotel manager about "bad men and being touched," gesturing toward her breasts, vagina, and butt. The hotel manager reported Victim's disclosures to the police and to Mother. Mother then stopped letting Victim spend time with the hotel manager.

At or near the same time, the FBI opened an investigation into human trafficking reports involving Victim. On July 7, 2017, the FBI and a Columbia police detective contacted Victim and Mother at the hotel, and took Victim into protective custody on suspicion of child abuse and neglect. Victim was forensically interviewed. Due to developmental speech difficulties, she used anatomical drawings to describe how she had

---

[2]"On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict." *State v. Moore*, 687 S.W.3d 1, 4 n.2 (Mo. App. W.D. 2024) (quoting *State v. Morgan*, 674 S.W.3d 497, 500 n.1 (Mo. App. W.D. 2023)).

been abused.  The police detective noted that Victim was not articulate, and did not appear to have the mental capacity to come up with wild stories about how she had been abused.

Victim began seeing a counselor, who observed that Victim spoke in partial sentences, had limited concentration, and avoided discussions about her family.  Victim told the counselor that she had been raped, and that "Uncle Bill" had hurt her.  Victim referred to Thomas as "Uncle Bill."

In one early session with the counselor on July 11, 2017, Victim was unable to verbalize how Thomas had hurt her and used dolls to demonstrate.  Victim named the male doll after Thomas, took its pants off, pointed to its penis, and said that Thomas "put that there," pointing to the vaginal area of the female doll.  Victim told the counselor that this occurred at the hotel.  Victim then placed the male doll on top of the female doll and said that Thomas "bumped" her, and that it hurt "down there."  Victim told the counselor that medicine was put in her arm which made her fall asleep.  The counselor testified that Victim had injection points on her arm in the location she had indicated.  The counselor also testified that Victim displayed signs of stress, and formed a fetal position during this session.

In a counseling session on July 16, 2018, Victim asked the counselor to get the dolls and said that "bad men hurt" her, and mentioned Thomas and someone she called "Uncle Dave."  The counselor reported the abuse to the child abuse hotline.

Victim was placed with a foster family.  Her foster dad described her as a four- or five-year-old in demeanor and intelligence level.  He explained that she spoke in short

3

sentences, and did not function verbally as would be expected of a child her age. He also explained that Victim played with her five-year-old foster sibling as a three-year-old would.

Victim could not take care of herself. She relied on others to dress her, brush her teeth, comb her hair, maintain her hygiene, and make her food. Victim could not make decisions about such things like adjusting or controlling the water temperature to wash her hands or to take a shower.

Though the initial allegations of sexual trafficking could not be substantiated, evidence of neglect kept Victim in foster care. In 2018, Victim began participating in a reunification process with Mother, with supervised visits scheduled at a counseling center in Moberly. Victim's foster dad took Victim to a therapy session that was supposed to include Mother. After the session, Victim was visibly disturbed, and told her foster dad that she did not want to be around "the bad man." The foster dad learned that Thomas had also attended the therapy session. Victim asked her foster dad to keep Thomas away from her, and expressed worry that he would be at the next therapy session. Victim told her foster dad how Thomas had hurt her, that she was scared of Thomas, and that Thomas put his "thing" between her legs while pointing to her vagina.

Victim reported that Thomas would tell her during instances of abuse to "hold on" as "it would be over in a minute." Victim reported that Mother loaned her out to Mother's boyfriends. Victim disclosed to her foster mom and to the counselor that she had to suck a penis, and that Mother would watch the sexual abuse.

4

Victim's therapist described Victim as having childlike verbiage, and as conversing at the level of a kindergartner. Victim described the abuse she had endured by Thomas to her therapist.

On several occasions, Victim participated in recorded interviews at a child advocacy center. The video recordings were admitted at trial. During the interviews, Victim claimed to be 8-years old, and did not know what a sibling was. She confused Mother with her foster mom. Victim reported that she was injected with a substance that made her fall asleep during instances of abuse. Her demeanor and limitations as had been described by several witnesses was evident in the recorded interviews.

Victim's video-taped deposition was also played for the jury. In that deposition, Victim could not count past ten or name the days of the week.

The jury found Thomas guilty of first-degree rape, and recommended a twenty-eight-year sentence. The trial court entered a judgment of conviction and sentence accordingly ("Judgment").

Thomas appeals.

## Analysis

Thomas challenges his conviction on the basis of the sufficiency of the evidence to establish beyond a reasonable doubt that Victim was incapable of consenting because of a lack of capacity to authorize sexual intercourse. In his point on appeal, Thomas contends that "there was no evidence presented by any witness on the required element that [Victim's] mental condition caused her to be unable to consent to sexual intercourse."

5

We review a challenge to the sufficiency of the evidence to determine whether the evidence is sufficient for a reasonable juror to find each element of a crime beyond a reasonable doubt. *State v. Nash*, 339 S.W.3d 500, 508-09 (Mo. banc 2011). In conducting this review, "all evidence favorable to the State is accepted as true, including all favorable inferences drawn from the evidence. All evidence and inferences to the contrary are disregarded." *Id*. at 509 (citation omitted).

The offense of first-degree rape is defined at section 566.030.1:

A person commits the offense of rape in the first degree if he or she has sexual intercourse with another person who is incapacitated, incapable of consent, or lacks the capacity to consent, or by the use of forcible compulsion. Forcible compulsion includes the use of a substance administered without a victim's knowledge or consent which renders the victim physically or mentally impaired so as to be incapable of making an informed consent to sexual intercourse.

The essential elements of the offense are, therefore: (i) sexual intercourse with a person, (ii) without that person's consent. The lack of consent can be established in several ways, including because a person is incapacitated, is incapable of consent, lacks the capacity to consent, or was forcibly compelled.

Here, Thomas was charged by information with the offense of rape in the first degree based on an allegation that on or between January 1, 2017 and July 7, 2017, Thomas had sexual intercourse with Victim, "a person who was incapable of consent because of a lack of mental capacity to authorize the sexual intercourse and this mental capacity was known" to Thomas. Correspondingly, Thomas' offense was submitted to the jury with a verdict director, that required the jury to find that between January 1, 2017 and July 7, 2017, Thomas knowingly had sexual intercourse with Victim, and did so

6

"knowing that [Victim] was incapable of consent because of a lack of mental capacity to authorize the sexual intercourse and this mental condition was known to [Thomas]." The State thus relied on the option of Victim's "lack of capacity to consent" to establish Thomas's guilt. The verdict director advised the jury that "[a]s used in this instruction, 'consent' or lack of consent may be expressed or implied. Assent does not constitute consent if it is given by a person who lacks the mental capacity to authorize conduct charged to constitute the offense and such mental incapacity is manifest or known to the actor." This definition of consent was drawn from section 556.061(5)(a) in effect at the time of Thomas' alleged offense.[3]

The question thus squarely presented by Thomas's appeal is whether the evidence was sufficient to permit a reasonable fact-finder to conclude beyond a reasonable doubt that Victim was incapable of consenting to sexual intercourse with Thomas because of a lack of mental capacity to authorize the sexual intercourse. Though Thomas claims in his point on appeal that "no evidence" was "presented by any witness" on this required element, Thomas' true contention as revealed in the argument portion of his Brief is that

---

[3]Section 556.061(5)(b) and (c) in effect in 2017 also respectively explain that assent does not constitute consent if: "given by a person who by reason of youth, mental disease or defect, intoxication, a drug-induced state, or any other reason is manifestly unable . . . to make a reasonable judgment about the nature of the harmfulness of the conduct"; or is "induced by force, duress or deception." Although the State sprinkles in a discussion of facts in its Brief to suggest that these definitions of "consent" are relevant to our review of the record to determine the sufficiency of the evidence to support Thomas's conviction, because Thomas's offense was neither charged or submitted to the jury based on a definition of "consent" that contemplated Victim's youth, a mental disease or defect, a drug-induced state, or the use of force or duress, we disregard that extraneous discussion in evaluating the sufficiency of the evidence to support Thomas' conviction.

The applicable definition of "consent" now appears at section 556.061(14).

the lack of mental capacity to consent to sexual relations must be established by expert testimony. Thomas does not challenge that there was substantial evidence admitted at trial, including from treating professionals, about Victim's mental limitations and disabilities. Instead, he argues that because no expert witness testified that those mental limitations and disabilities rendered Victim incapable of consenting to sexual intercourse, the State failed to submitted sufficient evidence to support his conviction for first-degree rape as a matter of law.

Thomas' contention is without legal support. To the contrary, "[a]s our sexual-offense laws have developed, juries have retained the ultimate authority to determine if the State has met its burden to prove a first-degree sexual offense involving a[] . . . victim incapable of consent." *State v. Dickerson*, 609 S.W.3d 839, 845 (Mo. App. E.D. 2020) (citation omitted). "Missouri cases as far back as the early twentieth century acknowledge the breadth of what evidence may support a jury's finding that a victim is incapable of consent." *Id*. (citing *State v. Atkins*, 292 S.W. 422, 426 (Mo. 1926)).

We therefore reject Thomas' contention that in the absence of an expert opinion concluding that an established mental condition rendered a victim incapable of consent, a fact-finder cannot find beyond a reasonable doubt that a victim was incapable of consent based on a mental condition. To the contrary, the State can present expert testimony on the ultimate issue of a victim's capability to consent in a sexual offense case, and there are reported cases where the State has, in fact, elected to do so. *See, e.g., State v. Cone*, 3 S.W.3d 833, 839 (Mo. App. W.D. 1999) (holding evidence was sufficient to prove that victims of sexual offenses, who were patients of the psychiatrist defendant, were

8

incapacitated because of their mental condition where three expert witnesses testified that the victims were unable to appraise the nature of their conduct and were unable to communicate their unwillingness to act); *State v. Davie*, 638 S.W.3d 514, 518 (Mo. App. W.D. 2021) (noting that a forensic psychologist testified that the victim of sexual offenses did not have the capacity to consent to sexual activity). But, the State is *not required* to present expert testimony on the ultimate issue of a victim's capability of consenting to sexual intercourse in light of a mental condition in order to present sufficient evidence permitting a finding of guilt beyond a reasonable doubt. Instead, settled jurisprudence confirms that whether a victim's mental capacity renders her incapable of consenting to sexual activity is "a question for the jury to determine." *Id*. at 840 (holding that "old cases in which the issue of the victim's consent to sexual activity turned on mental capacity . . . stand for the proposition that 'weak-mindedness,' 'unsound mind' or 'imbecility of mind.' as it related to one's ability to know or comprehend the nature of the act, was a question for the jury to determine") (citing *State v. Cunningham*, 12 S.W. 376, 378 (Mo. 1889); *State v. Williams*, 51 S.W. 88, 88 (Mo. 1889); *State v. Warren*, 134 S.W. 522, 524 (Mo. 1911); *State v. Schlichter*, 173 S.W. 1072, 1076 (Mo. 1915); *State v. Helderle*, 186 S.W. 696, 697 (Mo. banc 1916); *State v. Robinson*, 136 S.W.2d 1008, 1009 (Mo. 1940)).

Thomas acknowledges *Cone*, and its affirmation that the determination of a victim's capability to consent to sexual intercourse is a question for the jury to determine. But he relies on *State v. Robinson* to urge that evidence a sexual offense victim is "weak minded" is insufficient to show that the victim is incapable of consenting, 136 S.W.2d at

1009, and then extrapolates from that holding that expert witness testimony is required to connect a victim's "weak-mindedness" to the lack of capability to consent.

Thomas' argument is flawed. The issue in *Robinson* was not whether the victim had the capability of mind to consent to an act of intercourse. The issue in *Robinson* was whether the defendant had knowledge of the victim's mental condition--a separate component of the definition of "consent." 136 S.W.2d at 1009-1010 (noting that State conceded that "there was no substantial evidence that defendant had knowledge of the [victim's] legal incapacity to consent," and reversing conviction on that basis). Here, Thomas does not argue that there was insufficient evidence of his knowledge of Victim's mental limitations and conditions and of her corresponding incapacity to consent to having sexual intercourse.

Thomas next argues that our courts should impose an obligation on the State to present expert witness testimony on the ultimate issue of a sexual offense victim's lack of capability to consent based on a mental condition. He analogizes the essential element of lack of capability to consent based on a mental condition to a trial court's determination of a criminal defendant's competence to stand trial, which contemplates expert analysis pursuant to section 552.020.

It is true that pursuant to section 552.020.1, "[n]o person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried . . . ." And it is true that sections 552.020.2 and .3 contemplate the appointment of a psychiatrist or psychologist to examine the accused for the purpose of preparing a report that expresses an opinion as to whether the accused has

10

a mental disease or defect that leaves the accused lacking of the capacity to understand the proceedings against him or to assist in his own defense. However, the protections afforded by section 552.020 reflect only that certain "competencies" in the context of criminal proceedings are so steeped in a defendant's constitutional due process rights as to warrant special procedural protections. *State v. Driskell*, 459 S.W.3d 412, 423 (Mo. banc 2015) (holding that "the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him [or her] of his [or her] due process right to a fair trial") (quoting *Drope v. Missouri*, 420 U.S. 162, 172 (1975)). Though a criminal defendant's competence to stand trial is determined by a statutory procedure that contemplates expert witness testimony, that does not mean that the determination of mental capacity in every context of a criminal proceeding requires expert witness testimony. For example, "[t]he level of competency required to waive the constitutional right to counsel is the same level of competency required to stand trial." *State v. Wise*, 879 S.W.2d 494, 507 (Mo. banc 1994) (overruled on unrelated grounds by *Joy v. Morrison*, 254 S.W.3d 885, 888 n. 7 (Mo. banc 2008) (citing *Godinez v. Moran*, 509 U.S. 389, 401 (1993)). Yet, there is no authority for the proposition that a defendant's competency to waive the right to counsel requires expert witness testimony on that ultimate issue, and instead, the authority to determine whether a criminal defendant has intelligently and competently waived the right to counsel is vested in the trial court. *Godinez*, 509 U.S. at 401-402. And, "[t]he competence required to proceed effectively pro se is not the same level of mental competence the constitution requires to be criminally tried or to waive the right to counsel," supporting rejection of a

11

defendant's contention that the trial court should have reopened section 552.020 competency proceedings "because of [his] alleged deficiencies in trial tactics and trial mistakes." *Wise*, 879 S.W.2d 508. We reject Thomas's assertion that statutory procedures for determining a criminal defendant's competence to stand trial require the conclusion that expert witness testimony must establish a victim's lack of capability to consent to sexual activities based on a mental condition.

Thomas also argues that expert witness testimony is required to establish a defendant's defense of diminished capacity or mental defect or disease. Thomas relies on *State v. Erwin*, 848 S.W.2d 476 (Mo. banc 1993), as modified on denial of reh'g (March 23, 1993), to support this proposition. *Erwin* does not, however, hold that the connection between a mental condition and its impact on a sexual offense victim's capability of providing consent can only be established by expert testimony. In fact, and to the contrary, our Supreme Court in *Erwin*, held that "[w]here expert testimony [that a defendant was incapable of knowing the nature and consequences of his conduct] is not offered as a diagnosis of mental disease or defect showing a defendant was incapable of having a specific mental state [required as an element of an offense], ***the opinion is merely a conclusion that can be drawn by a juror***," and is thus "superfluous." 848 S.W.2d at 480-81 (emphasis added). *Erwin* supports the proposition that the lack of capacity to consent to sexual intercourse based on a mental condition is a factual determination that can be made by a jury without the benefit of expert witness testimony on the ultimate issue.

12

For the reasons explained, Thomas' contention that an expert witness was required to testify that Victim's mental limitations left her not capable of consenting to sexual intercourse with him is without merit. Thomas does not otherwise contend that the evidence of Victim's mental limitations was insufficient to permit a reasonable fact-finder to conclude beyond a reasonable doubt that Victim was incapable of consenting to having sexual intercourse with Thomas based on a mental condition. The evidence was sufficient to support Thomas' conviction of first-degree rape.

Thomas' point on appeal is denied.

## Conclusion

The trial court's judgment is affirmed.

_____
Cynthia L. Martin, Presiding Judge

All concur

13