**STATE of Missouri, Respondent,**

v.

**Joyce DARNELL, Appellant.**

**No. WD 45608.**

Missouri Court of Appeals,
Western District.

June 15, 1993.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 27, 1993.

Ronald L Holt, Bryan Cave, Robert M. Thompson, Rouse, German, Hendricks, May & Shank, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before ULRICH, P.J., and TURNAGE and HANNA, JJ.

ULRICH, Judge.

Joyce Darnell appeals her conviction, following a jury-waived trial, of one count of stealing property of a value exceeding $150.00, a Class C felony, in violation of section 570.030, RSMo 1986. Ms. Darnell also appeals the denial of her postconviction motion for a new trial. Ms. Darnell contends on appeal that her conviction should be reversed and she should be adjudged not guilty by reason of mental disease or defect or she should be granted a new trial because (1) the report of the psychiatric evaluation of her performed by Dr. John H. Wisner should have been excluded from evidence and (2) the prosecutor was erroneously permitted to introduce evidence of Ms. Darnell's prior criminal conduct during the cross-examination of Dr. Steven Mandracchia, which constituted "prosecutorial misconduct" and had an "unavoidable adverse effect on the trial court's judgment and on its adjudication of

[Ms. Darnell's] guilt or innocence."[1] The judgment of the trial court is affirmed.

On the afternoon of November 14, 1989, Joyce Darnell entered the Jones Store Company (Jones Store) in the Blue Ridge Mall in Kansas City, Missouri, and began picking up an assortment of merchandise without paying for it. Ms. Darnell was first observed carrying a shopping bag with a coat over her arm by a Jones Store "Loss Prevention Supervisor" on the lower level of the store. The supervisor watched Ms. Darnell pick up two Christmas bells and carry them around the store in her hand for a period of time. The supervisor subsequently noticed that the bells were no longer in Ms. Darnell's hands. Although he did not see what she had done with them, the supervisor and another loss prevention officer heard the bells ringing in her bag.

The supervisor followed Ms. Darnell up the escalator to the jewelry department of the store, where he saw her remove some items of jewelry and place them in her hand. She then placed her coat over her hand and dropped the items into the shopping bag she carried on her arm. She repeated this conduct "numerous times" over a period of an hour and ten minutes, dropping three to five items in her shopping bag or coat pocket each time. The supervisor estimated that at least three or four times during this activity, Ms. Darnell walked toward the south door of the store as if she were going to leave. The supervisor followed her to the door, but each time Ms. Darnell did not leave. Instead, she would wander back to the jewelry department and "start all over with the same procedure."

Before leaving the store, Ms. Darnell approached a clerk in the Young Men's Department who handed her a small Jones Store sack. Ms. Darnell took the sack, walked to a bench near the south exit, and proceeded to remove the items from her shopping bag and coat pocket and place them in the Jones Store sack. She then placed the Jones Store sack in her shopping bag.

The supervisor estimated that Ms. Darnell walked by at least ten cash registers as she wandered through the store. Eventually, Ms. Darnell left the store and began walking quickly to a bus which was pulling up to the curb. The supervisor stopped her before she could board, identified himself, and told her she had some items "she knew didn't belong to her." At that point, Ms. Darnell responded that she was sorry and that she wanted the items as gifts for friends but did not have any money. She told the supervisor that she was staying at a halfway house and that if the store pressed charges against her there was a chance she would go back to prison.

After retrieving the shopping bag from Ms. Darnell, the supervisor inventoried its contents. The bag contained twenty-two items from the jewelry department, two Christmas bells, and a gift trim heart. The retail value of the items was $378.15; their wholesale value was slightly more than $180.00.

The supervisor and other Jones Store security personnel took Ms. Darnell to the loss prevention office where they held her pending the arrival of the police. While they waited, Ms. Darnell engaged in a rambling conversation, apologizing profusely for her actions, expressing concern that her behavior might affect her pending application for a job at the Jones Store, explaining a skin disorder she suffered from, and recounting her family history and her life in general. In describing the conversation, the supervisor commented, "It's like I crossed into the Twilight Zone."

Ms. Darnell was taken into custody and subsequently questioned by Richard White, a Kansas City police detective assigned to the department's Fraud Unit. After reading aloud and signing a *Miranda* waiver form, Ms. Darnell told Detective White that it was getting close to Christmas and that while she was in the Jones Store, she began thinking about the fact that other

---

1. Ms. Darnell raises three points on appeal; her second and third points are combined and addressed in this opinion as point two.

members of the facility where she lived were getting presents at that time of the year and "she decided she wanted to get some gifts for Christmas." She indicated to the detective that she realized she had not paid for the items and that it "was wrong and it was against the law" to leave the store without paying for them. According to Detective White, "[Ms. Darnell's] indication was, basically, that she just wanted them."

Ms. Darnell was charged on December 4, 1989, with stealing property with a value of over $150.00, in violation of section 570.030, RSMo 1986. On December 6, 1989, she pleaded not guilty to the charge. On February 2, 1990, the State was permitted to file an amended information charging Ms. Darnell as a persistent offender, section 558.016, RSMo 1986.

In April of 1990, Ms. Darnell sought leave to file notice of her intent to rely on the defense of not guilty by reason of mental disease or defect. The trial court granted Ms. Darnell's request on April 12, 1990, and ordered that Ms. Darnell be evaluated pursuant to the provisions of sections 552.020 and 552.030, RSMo 1986. Ms. Darnell was subsequently examined by Steven Mandracchia, Ph.D., Director of the Forensic Department of the Western Missouri Mental Health Center, and Michael Brady, M.A., a psychology intern. On April 15, 1990, a report of that examination was filed with the court. In their report, the examiners concluded that Ms. Darnell suffered from "a chronic, long-standing Impulse Control Disorder in the form of Kleptomania" and that "[her] behaviors at the time of the alleged criminal conduct may best be conceptualized as resulting from [an] acute phase ... of Kleptomania, which would have substantially compromised her ability to conform her behavior to the requirements of the law."

The State filed its objection to the report of Drs. Mandracchia and Brady and requested a second mental examination pursuant to section 552.020. On August 2, 1990, the trial court granted the State's request, ordering that the State be allowed to have Ms. Darnell "examined, tested and evaluated by a psychiatrist at its own expense, and said examination to be completed and a report filed with the Court within 60 days." The examination by the State's psychiatrist, Dr. John H. Wisner, was completed on November 28, 1990; the report of the examination was filed on April 10, 1991.

Ms. Darnell's jury-waived trial began on June 24, 1991. Dr. Mandracchia testified at trial that Ms. Darnell suffered from kleptomania, which disorder he stated "is conceptualized as a failure to resist an impulse for the purpose of reducing underlying anxiety." Dr. Mandracchia testified that he concluded Ms. Darnell was suffering from kleptomania at the time of the offense based upon the manner in which she picked up the merchandise at the Jones Store, the type of property taken, her report of the type of stress she was under at the time, her account of similar episodes of shoplifting at earlier times in her life, and her family background.

In reaching the conclusion that Ms. Darnell was suffering from kleptomania, Dr. Mandracchia testified that he had ruled out an alternative diagnosis of antisocial personality disorder, which is characterized by a pattern of criminal acts manifesting little regard for others. Dr. Mandracchia stated on direct examination that at the time he made his initial diagnosis he had not received or reviewed any materials relating to any other criminal offenses of which Ms. Darnell had been convicted. After he had prepared his report, he was provided various materials documenting Ms. Darnell's prior criminal record. Upon reviewing these materials, he stated that nothing contained in them caused him to question his initial diagnosis.

On cross-examination, Dr. Mandracchia was asked if he was aware that Ms. Darnell had engaged in other specific acts of theft and antisocial conduct including using aliases and failing to obtain gainful employment. Over Ms. Darnell's objections, most of the questions in this line of questioning were allowed, although the trial court noted that "unless it's proven, it's not going to have any impact on me."

In rebuttal, the State presented the testimony of John H. Wisner, M.D., the Director of Inpatient Psychiatry at the Veteran's Administration Medical Center in Kansas City, Missouri, and an Assistant Professor of Psychiatry at the University of Kansas Medical Center. Dr. Wisner testified that Ms. Darnell did not suffer from kleptomania but, rather, suffered from an antisocial personality disorder and also had "some histrionic personality features."

The trial concluded on June 26, 1991, at which time the trial court announced that it was accepting the testimony of Dr. Wisner that Ms. Darnell did not suffer from kleptomania. Accordingly, Ms. Darnell was convicted of stealing goods of a value greater than $150.00. On October 10, 1991, the trial court denied Ms. Darnell's motion for a new trial. On November 27, 1991, the trial court sentenced Ms. Darnell to confinement in the custody of the Department of Corrections for a period of eight years.

## I.

Ms. Darnell contends as her first point on appeal that her conviction should be reversed and she should be adjudged not guilty by reason of mental disease or defect because the psychologist appointed by the court to conduct a mental examination of Ms. Darnell concluded that she was unable to conform her behavior to the requirements of the law at the time of the offense and because the State's contrary medical report should have been excluded from evidence for being filed in violation of the statutory time limitations. Ms. Darnell further claims the State's actions denied her a speedy trial under the Sixth Amendment to the United States Constitution, section 18(a), article I of the Missouri Constitution, and section 545.780, RSMo 1986.

When an accused contends she lacks the mental capacity to be tried or convicted for a crime or when she pleads not guilty by reason of a mental disease or defect at the time of the criminal conduct, the trial court must appoint one or more private psychiatrists or psychologists to examine the accused and render a report detailing their findings. §§ 552.020.2, 552.030.3, RSMo 1986. If either the accused or the State objects to the findings of the court-ordered psychiatrist or psychologist, the objecting party may request that the trial court grant another mental examination by a psychiatrist or psychologist of that party's choosing at that party's expense. §§ 552.020.6, 552.030.3. This second examination must be completed and the results filed with the court within sixty days of the order "unless the court, for good cause, orders otherwise." §§ 552.020.6, 552.030.3.

In this case, the trial court initially ordered that the State complete its mental examination of Ms. Darnell and file a report of the examiner's findings within sixty days of August 2, 1990. The trial court subsequently twice extended the deadline for the State to file the report of its psychiatrist, Dr. Wisner, with the court. The report was ultimately due on April 12, 1991; the State filed the report on April 10, 1991.

▉ Ms. Darnell insists that the State's delay in filing Dr. Wisner's report was without good cause. Because the determination of whether a party has shown good cause for completing a mental examination and/or filing a report of the exam after the sixty-day time limitation is within the trial court's discretion, the decision of the trial court will be reversed only if an abuse of that discretion has occurred.

▉ A review of the record indicates that the trial court did not abuse its discretion in accepting the State's medical report. The report filed by Drs. Mandracchia and Brady stated that the sources of information for the report included personal letters written by Ms. Darnell, professional letters received by Ms. Darnell from The Menninger Clinic, and a mental status examination of Ms. Darnell which included a formal personality assessment. Dr. Wisner was entitled to review these documents in conducting his examination of Ms. Darnell, for when Ms. Darnell pleaded not guilty by reason of mental disease or defect, she opened up the inquiry into her mental condition. *State v. Carter*, 641 S.W.2d 54, 57 (Mo. banc 1982), *cert. denied*, 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983). She

effectively waived the physician-patient privilege to exclude the testimony of any doctors who examined her for the purpose of determining her mental condition, and the State became entitled to disclosure of the underlying factual basis of her plea and the result of examinations by her psychiatrists. *Id.* Drs. Mandracchia and Brady would not release these documents, however, without written permission from Ms. Darnell.

On September 24, 1990, the State sent a letter to Ms. Darnell's attorney at the time seeking a signed release from Ms. Darnell authorizing Drs. Mandracchia and Brady to forward the documents to Dr. Wisner for his review prior to his examination. Ms. Darnell apparently refused to sign the release, and on October 17, 1990, the State filed a motion seeking a court order providing for the release of the documents. Ms. Darnell countered by filing a motion for an order to show cause why the sixty-day period designated for the completion of the State's examination and filing of its report in the August 2, 1990, order should be extended. The circuit court subsequently granted the State's order for production of documents and denied Ms. Darnell's motion to show cause. The State was ordered to have the mental examination completed and the case was set for trial on December 3, 1990.

Notwithstanding the court's order, Western Missouri Mental Health Center was hesitant to produce the documents sought by the State. In order to complete the examination before the trial date, Dr. Wisner examined Ms. Darnell on November 28, 1990, without the benefit of the documents the court had directed Western Missouri Mental Health Center to produce.

Prior to Dr. Wisner's examination, the State had sent Ms. Darnell's attorney all of the materials it had provided to Dr. Wisner in preparation for his interview with Ms. Darnell. On November 29, 1990, the State produced Dr. Wisner for interview by Ms. Darnell's attorney.

On December 3, 1990, the State was prepared for trial even though it still had not received the documents the circuit court had ordered be produced. Ms. Darnell, however, was granted a continuance on that date, apparently after her successful bid to assert her right of self-representation. The case was next set for trial during the week of January 7, 1991. Once again, the State announced it was ready for trial, but Ms. Darnell asked for and was granted another continuance. The case was then set for trial during the week of February 19, 1991.

Ms. Darnell obtained a continuance from the February 19, 1991, setting after she stated that she no longer wished to represent herself. Ms. Darnell told the court that a new team of attorneys was ready to enter its appearance on her behalf provided the case be continued until the end of March. The court granted the continuance.

At the end of March, Ms. Darnell filed a motion to exclude any evidence of the State's mental examination.[2] The circuit court denied Ms. Darnell's motion to exclude the testimony of Dr. Wisner on April 3, 1991, and ordered the State to file and serve Dr. Wisner's report on or before April 12, 1991. The State filed the report on April 10, 1991.[3]

Ms. Darnell should not benefit from her failure to cooperate with the State in the State's efforts to obtain the court-authorized second mental examination. To have required the State to have Dr. Wisner complete his report and file it strictly within the time limits provided for in the August 2, 1990, order or the October 22, 1990,

2. Ms. Darnell may have sought to proceed pro se again in this case at this time. The legal file contains an order dated March 27, 1991, granting "Defendant's counsel's motion to withdraw" and a response by the State to Ms. Darnell's motion "to defend this case pro se" dated April 1, 1991. The trial court appointed Ms. Darnell's trial counsel to represent her on June 26, 1991, retroactive to April 12, 1991.

3. Dr. Wisner testified at trial that he eventually received some of the documents sought by the State. His report, however, does not include them in his list of documents reviewed in preparation for his evaluation.

order, without the advantage of all the materials available to Drs. Mandracchia and Brady, would have allowed Ms. Darnell to profit from her refusal to cooperate. Although the court did not specify its reasons for granting the two filing extensions, Ms. Darnell's failure to provide the documents sought by the State constitute good cause and justify the extensions.

As another facet of her argument under her first point on appeal, Ms. Darnell contends that the State's delay in obtaining and filing the report of its examiner "violated [her] right to receive as speedy a trial as possible under the Sixth Amendment to the United States Constitution, Section 18(a) of Article I of the Missouri Constitution, and R.S.Mo. § 545.780." Since the failure to comply with section 545.780 does not constitute grounds for the dismissal of an indictment or information unless accompanied by a court finding that the defendant has been denied her constitutional right to a speedy trial, § 545.780.2, RSMo 1986, the question of whether a constitutional violation has occurred must be answered first.

In cases where it is claimed that a violation of a defendant's Sixth Amendment rights to a speedy trial has occurred, Missouri courts follow the guiding concepts laid down by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). *State v. Ingleright*, 787 S.W.2d 826, 831 (Mo.App.1990). The Supreme Court decided in *Barker* that a rigid formula would not be proper but rather each case should be submitted to a balancing test, taking into consideration four factors: (1) the length of pretrial delay, (2) the reasons for the delay, (3) the defendant's assertion of her right to a speedy trial, and (4) whether the delay resulted in prejudice to the defendant. *Id.; State v. Robinson*, 696 S.W.2d 826, 831 (Mo.App. 1985).

■ In applying the first factor of the four-factor test to the facts of this case, it must be noted that the length of pretrial delay is to some extent a "triggering mechanism," for unless the delay is presumptively prejudicial, there is no need to inquire into the other three factors. *State v. Nelson*, 719 S.W.2d 13, 18 (Mo.App.1986); *Robinson*, 696 S.W.2d at 831. Ms. Darnell was arrested on November 14, 1989, and the trial commenced on June 24, 1991. Missouri courts have stated that a delay of eight months or longer is presumptively prejudicial. *Ingleright*, 787 S.W.2d at 831. This court assumes, arguendo, that the delay in this case was presumptively prejudicial. *Id.*

■ The second factor to be weighed is the reason for the delay. The delay in this case was caused in large part by Ms. Darnell's actions: waiting until four months after her arrest to enter her plea of not guilty by reason of mental disease or defect, refusing to sign a release granting Western Missouri Mental Health Center permission to release documents relied on by Drs. Mandracchia and Brady in making their diagnosis, and seeking and obtaining three continuances in connection with her decisions about defense counsel. "Where the defendant 'has contributed to the delay by asking for and being granted continuances, he cannot later successfully allege the denial of his constitutionally guaranteed right to a speedy trial.'" *Robinson*, 696 S.W.2d at 832 (quoting *State v. Harris*, 673 S.W.2d 490, 494 (Mo.App.1984)). Delays attributable to the defendant weigh heavily against the defendant. *Ingleright*, 787 S.W.2d at 831.

■ The third factor for consideration is when and how the defendant asserted her right to a speedy trial. There is no fixed requirement for when the right must be asserted; rather, "the circumstances surrounding the assertion or failure thereof" comprise the factor to be weighed. *Nelson*, 719 S.W.2d at 19. While Ms. Darnell did file a request for a speedy trial on October 3, 1990, Ms. Darnell subsequently sought three continuances, thus indicating a desire to avoid a speedy trial.

■ The final and most important factor in the speedy trial analysis is whether the delay actually prejudiced the defendant. *Id.* This factor is assessed in light of the interests protected by the speedy trial

right: (1) prevention of oppressive pretrial imprisonment, (2) minimization of the defendant's anxiety and concern, and (3) limitation of the possible impairment of the defense. *Ingleright*, 787 S.W.2d at 832; *Nelson*, 719 S.W.2d at 19. The most important of these interests is the last—whether the delay has prejudiced the defendant's ability to make a defense. *Robinson*, 696 S.W.2d at 833. Ms. Darnell contends that because of the delay she was unable to locate Dr. Mandracchia's intern assistant, Dr. Brady, to offer his corroborating testimony at trial. According to Ms. Darnell, "[t]he availability of Dr. Brady, who had actually participated in the interview and diagnosis of [her], to testify and corroborate Dr. Mandracchia's opinion could have been vitally important to the defense."

■ To require reversal, any claimed prejudice resulting from delay must be actual prejudice apparent on the record or by reasonable inference. *Id.* at 832. Speculative or possible prejudice is not sufficient. *Id.* Nothing in the record or reasonable inference therefrom shows how the delay prevented Ms. Darnell from keeping track of Dr. Brady. Her claim that the corroborating testimony of the intern "could have been vitally important to the defense" is merely speculative.

Although the length of delay in this case may be presumptively prejudicial, the presumption is overcome by the other factors in this case, including Ms. Darnell's own contribution to the delay. Ms. Darnell was not denied her constitutional right to a speedy trial. Point one is denied.

## II.

As her second point on appeal, Ms. Darnell contends that her conviction should be reversed and a new trial ordered because the prosecutor was erroneously permitted to introduce evidence of Ms. Darnell's prior criminal conduct during the cross-examination of Dr. Mandracchia, which was "intended to undermine and effectively did undermine Dr. Mandracchia's credibility." Ms. Darnell claims the questions directed to Dr. Mandracchia constituted "prosecutorial misconduct" and had "an unavoidable adverse effect on the trial court's judgment and on its adjudication of [Ms. Darnell's] guilt or innocence."

■ The trial court has broad discretion in determining the extent of cross-examination. *State v. Cutts*, 600 S.W.2d 75, 76 (Mo.App.1980). Permissible cross-examination may extend to "all matters within the fair purview of direct examination, and may include some collateral matters." *Id.* An expert witness may be cross-examined regarding facts not in evidence to test his qualifications, skills, and credibility, or to test the weight and validity of his opinion. *State v. Goree*, 762 S.W.2d 20, 23 (Mo. banc 1988); *Cutts*, 600 S.W.2d at 76.

Dr. Mandracchia stated on direct examination that after he had initially concluded that Ms. Darnell was suffering from kleptomania and not antisocial personality disorder at the time of the offense, he received materials relating to Ms. Darnell's criminal record, including "several presentencing investigation reports on the Defendant herself." In response to questions posed by counsel for Ms. Darnell, Dr. Mandracchia stated that upon reviewing the materials, "I didn't see anything that would cause me to question my diagnosis." In fact, he found "[t]here was information in those materials that [was] supportive of and consistent with the diagnosis." [4]

4. Ms. Darnell states in her reply brief that "[w]hen Mandracchia testified that he had not relied on the contents of the information supplied to him regarding other criminal acts in forming his opinion, at that point, the prosecutor should not have been allowed to inquire further." However, it was counsel for Ms. Darnell who inquired further, asking Dr. Mandracchia if anything in the materials supplied to him caused him to question his initial diagnosis and if he regarded the materials as supportive of and consistent with his initial diagnosis.

Ms. Darnell further contends in her reply brief that Dr. Mandracchia testified that he did not consider evidence of Ms. Darnell's other crimes in "forming his opinion." While he stated that he did not consider the evidence in arriving at his initial diagnosis, Dr. Mandracchia clearly stated during direct examination that he considered the evidence in adhering to his original opinion.

During cross-examination, the prosecutor questioned Dr. Mandracchia about allegations (1) that Ms. Darnell had taken eighty-two trash bags full of antiques, silverware, crystal, and other items of value from a seventy-two year old woman; (2) that on another occasion she had taken numerous green trash bags filled with antiques, bedding, crystal ware, and china from a different person; (3) that Ms. Darnell had used at least six aliases in five different states as well as a variety of dates of birth and places of birth; and (4) that she had not had any verifiable employment in at least twenty years. The prosecutor asked Dr. Mandracchia if knowledge of these acts would influence him to change his diagnosis. Ms. Darnell's counsel objected to each of these questions. The prosecutor stated that the questions were taken largely from a presentence investigation report prepared by the State of Missouri Board of Probation and Parole in June of 1987 and supplied to Dr. Mandracchia after his initial diagnosis with the materials relating to Ms. Darnell's criminal record.[5] The trial court sustained the objection made to the first question but denied Ms. Darnell's request for a mistrial, stating, "I don't believe I will be prejudiced by that question." The judge overruled the objections to the other three questions, noting each time that unless the underlying facts of the report were proven, he would disregard them. Dr. Mandracchia indicated that the acts alleged in the second and third questions would not be consistent with his diagnosis of kleptomania.

Appellate courts have recognized the importance of developing the factual basis of psychiatric testimony regarding mental responsibility and, consequently, have granted wide latitude to prosecutors cross-examining expert witnesses in this area. *United States v. Gillis*, 773 F.2d 549, 554 (4th Cir.1985). In *Gillis*, the prosecution was allowed to cross-examine the defendant's expert witness, who testified that the de-fendant suffered from "pathological gambling disorder," about the facts surrounding a prior crime of which the defendant had been convicted and the expert was aware. The court reasoned:

> It is important that the factfinder know the basis of [the expert's] diagnosis in order to attribute to it the proper credibility and weight. Since [the expert] testified that the specific type of conduct behind Gillis' prior conviction was taken into account in forming his diagnosis, that conduct was clearly relevant.

*Id.*

■■■ In this case, Dr. Mandracchia testified that the information contained in the materials given to him by the prosecution was "supportive of and consistent with the diagnosis" of kleptomania. The prosecutor was certainly allowed to test the weight and validity of Dr. Mandracchia's diagnosis by referring to incidents documented in the materials that he stated he considered in adhering to his original finding.

■■■ Ms. Darnell's claim that the trial court was prejudiced by questions for which there was no evidentiary support is unfounded. Because this was a court-tried case, this court on review presumes that any inadmissible evidence is not prejudicial, *State v. McMillin*, 783 S.W.2d 82, 96 (Mo. banc), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990), unless it is clear the trial court relied on that evidence in arriving at its findings of fact and conclusions of law. *State v. Sladek*, 835 S.W.2d 308, 313 (Mo. banc 1992). The trial judge in this case specifically stated when sustaining the objection to the first question that he did not believe he would be prejudiced by the question. In overruling the objections to the other three questions, the trial court emphasized, "I understand the underlying facts have not been proven. I will take that into consideration," "unless it's proven, it's not going to have any impact on me," and "the fact that [the prose-

---

5. The report refers to a bench warrant issued for Ms. Darnell's arrest on charges involving the theft of antiques, crystal ware, and household items taken away in green trash bags, to Ms. Darnell's use of aliases in the past, and to Ms. Darnell's lack of employment since the 1970's. The report does not include information to support the allegation that Ms. Darnell had taken eighty-two trash bags full of valuables from a seventy-two year old woman.

cutor] poses the question doesn't mean I'm accepting it as a fact." In overruling Ms. Darnell's motion for a new trial, the trial court stated:

[T]hese questions to Mandracchia did not bring anything before me that I had not already discussed as part of a discovery motion earlier in the case. It seems to me that this material arises from a PSI from another case much of which is contested by the defendant. I think the questions were permissible to test the basis of Dr. Mandracchia's opinion. I think that since the case [was] Court-tried, the questions were okay because I didn't see the questions as having been proven, and I do not accept any of the questions as having been proven, and I see them only as questions to test the doctor's opinion.

The State was allowed to test the weight and validity of Dr. Mandracchia's opinion by asking him about the material he stated he had considered after making his diagnosis and found to be supportive of his diagnosis. Nothing in the record indicates either that the trial court was prejudiced by any questions for which there was no evidentiary support or that "prosecutorial misconduct" occurred. Point two is denied.

The judgment is affirmed.

All concur.