STATE of Missouri, Respondent,

v.

William D. CONE, Appellant.

No. WD 55518.

Missouri Court of Appeals,
Western District.

Aug. 24, 1999.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 5, 1999.

Application for Transfer Denied
Nov. 23, 1999.

Joseph M. Hadican, Clayton, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., David B. Cosgrove, Asst. Atty. Gen., Jefferson City, for Respondent.

FOREST W. HANNA, Judge.

William D. Cone, a psychiatrist, was found guilty by a jury in Lafayette County Circuit Court, of six counts of first degree sexual assault, § 566.040, RSMo 1986, and 13 counts of first degree deviate sexual assault, § 566.070, RSMo 1986, as a result of sexual relations with two of his patients. The court sentenced him to 19 consecutive terms of seven years each. He appeals from these convictions, claiming that the evidence was insufficient to prove that the victims were "mentally incapacitated," and that the trial court erred in allowing the state to present expert testimony that the victims were credible.

The defendant began practicing psychiatry in West Plains, Missouri, in 1979. Rebecca and Jean were his patients.[1] The defendant practiced until 1994 when, at 70 years old, he lost his license as a direct result of the facts recited herein. Subsequently, in January 1997, the defendant was charged by information with sexually assaulting Jean, and encouraging another person to do so on one occasion, and sexually assaulting Rebecca, both between November 1993 and January 1994.[2] At trial, the defendant did not dispute that he engaged in sexual relations with both women. His contention at trial and on appeal was that the women were not "mentally incapacitated," as required for a conviction under § 566.040 and § 566.070. With respect to this issue, the state presented the testimony of three experts, the two victims and several other witnesses. The defendant also testified. The evidence, which supports the verdicts, is as follows.

## REBECCA

Rebecca first sought psychiatric treatment when she was 12 years old for problems related to a troubled childhood. In the Fall of 1993, Rebecca was involuntarily hospitalized by the defendant. She had been receiving treatment from the defendant since 1988, when she was 26 years old. He diagnosed her with bi-polar disorder, mixed type, borderline personality disorder, and substance abuse, primarily from her overuse of prescription medications. The hospital records showed that the defendant considered Rebecca's judgment so impaired that she could not make the decision to leave against medical advice. She was discharged from the hospital on September 26, 1993. The defendant's discharge notes stated that Rebecca had "poor judgment" and that her prognosis was "guarded." She was discharged with Prozac, Trazodone, Buspar, and Vistaril. It was a little over a month later

---

1. We refer to the victims by their first names not out of disrespect, but rather to provide a modest amount of anonymity.

2. The charges were six counts of first degree assault pursuant to § 566.040 (five against Jean and one against Rebecca) and thirteen counts of first degree deviate sexual assault pursuant to § 566.070 (two against Jean and eleven against Rebecca). The charges were originally filed in Howard County, but the case was transferred to Lafayette County as a result of defendant's change of venue request.

that the defendant commenced having a sexual relationship with her.

Following this hospitalization, the defendant encouraged Rebecca to become more trusting by discussing sexual fantasies. The defendant's "treatment" progressed from discussion of sexual fantasies to actual sexual contact. The defendant's discussions about sex were timed to tragic past events in Rebecca's life that caused her to be distraught and upset. It was during this time that the defendant started his "reparenting" therapy as a prelude to their sexual relationship.[3] In late 1993, the defendant told her that her condition was worsening and convinced her that if they had sex, it would help her treatment because she needed the nurturing she never received from her mother. The defendant gave her two pills and then they engaged in sexual intercourse and oral sex at his office. She testified that "[e]very time I saw him [after the initial sexual encounter] I had to give him oral sex" as part of the "nurturing process." She further testified that she did not enjoy the sexual contact, but believed it to be a part of her treatment. The sexual contact continued for approximately three months, until she got "high enough and drunk enough" to tell her family. On one previous occasion, while being forcibly medicated and restrained, Rebecca attempted to reveal the sexual aspects of her therapy. The defendant told her if she told anyone about the sexual aspect of her therapy, that he would have her involuntarily committed to a state mental hospital. She then tried to commit suicide.

Rebecca's psychiatric treatment with the defendant was very stormy. She was frequently angry and depressed, was using a variety of drugs and alcohol, and was often restrained, forcibly medicated and involuntarily hospitalized when she would not cooperate. She was involuntarily committed "several" times while under the care of the defendant.

During the treatment, the defendant prescribed Prozac, Trazodene and Klonopin for Rebecca. The defendant would only provide her with medication (specifically, samples of Xanax) when she had "done a good job."[4] On one occasion, the defendant showed Rebecca a gun that he kept in his office for "unruly patients." She took the incident as an implied threat and it frightened her because she considered herself to have been unruly. She testified that the defendant was her psychiatrist, but she also "trusted him as a father figure."

Dr. Stephen Jarvis, a board certified psychiatrist, was assigned by the Department of Mental Health to evaluate the defendant's patients. Dr. Jarvis reviewed the extensive medical records of both women, and the defendant's treatment notes. He then spent approximately two hours interviewing each victim. At trial, he testified as to the reasons why sexual relations between physicians and their patients are prohibited and to the concept of transference in which psychiatric patients have inaccurate preconceptions regarding their doctor's intelligence, wisdom and ability to heal.

Dr. Jarvis testified as to Rebecca's family background, lengthy mental health his-

**3.** One psychiatrist testified that the "[t]he general basic idea with reparenting is that a person was parented in a· bad, destructive way so now they have to go all the way back [into childhood] and actually be reparented in the counseling sessions that the patient feel and act like a child and reenact being a child with the parent." The defendant explained that reparenting consisted of cradling the patient "in your lap like a baby, and you bottle feed then and treat them like a baby; then take them through all of the stages, toddler on up."

**4.** Prozac and Trazodone are psychotropic medications. Xanax, Klonopin, Valium, and Lorazeperm are anti-anxiety medications. They are in the class of drugs known on the street as "mikeys" (Benzodiazepines). While taking Xanax, one drink may affect the individual like eight or more drinks, due to its "synergistic effect" with alcohol.

tory and diagnosis, and the treatment she received from the defendant. In order to assess Rebecca for malingering, Dr. Jarvis had to determine whether her story was internally consistent, whether it made sense from one part of the story to the other, whether it fit the facts available from outside sources, and if what she was telling him fit the nature of her illness. He testified, over objection, that it was part of his diagnosis to determine whether what Rebecca and Jean were telling him during his evaluation interviews was true, and to determine if their perceptions were distorted. Based on these criteria, he testified that he could rely on her statements to him as truthful. In his mental status examination, Dr. Jarvis testified that, due to Rebecca's mental condition, her dependant relationship on the defendant, and her addiction to prescription drugs, she would be extremely fearful of having her therapist and her medication taken away from her. In this context, he stated that Rebecca had the emotional age of a small child with respect to her relationship with the defendant, and that her intellectual capacities would be irrelevant in such a relationship. Dr. Jarvis considered Rebecca very depressed and anxious. He described her as "very, very fragile and shaken."

He concluded, within a reasonable degree of medical certainty, that Rebecca was not able to appreciate the nature of her sexual conduct with the defendant because of her mental illness and her belief that the conduct was part of her treatment. Additionally, he opined that she was unable to express her unwillingness to act because of her illness, as well as her dependence on the defendant and the prescription medication he was providing her.

Dr. Richard Scott, a psychologist and certified forensic examiner, also evaluated Rebecca. He reviewed her medical records and conducted a three-hour interview. Dr. Scott is employed by the Missouri Department of Mental Health as the Program Director for the Forensic Evaluation Program. During the interview, he described Rebecca as very, very nervous, she had a tremor in her hands, her voice quivered, and she was very, very anxious. He diagnosed her as having a personality disorder with dependant features, a severe bipolar disorder, post-traumatic stress disorder related to her history of rapes, and Benzodiazepine dependence. He believed that Rebecca was suffering from these disorders at the time she was sexually abused by the defendant.

Dr. Scott explained how Rebecca's dependent personality, coupled with her long-term transference with the defendant, worked together to prevent her from understanding the nature of her conduct. He testified that transference in a patient-therapist relationship can be manipulated to push a person into having sex, even if they did not want to, as with Rebecca, in the form of the "reparenting" therapy. He testified:

> [W]hen he started saying what you need is this form of treatment, and gives her a theoretical rationale of sorts for that treatment, she is going to believe it. So, for example, he reportedly said that she had been weaned from breast-feeding too early and that in order to address that conflict that came from being weaned too early, she needed to reattach to the breast and be weaned properly and that the penis could substitute for the breast, that would be a justification for oral sex. Obviously, that is not a genuine theoretical basis. It's not the basis for anything we do in mental health. But, I wouldn't expect a patient to know that.

Moreover, Dr. Scott testified that by threatening to withhold Rebecca's medication or to involuntarily commit her, the defendant further undermined her ability to express her unwillingness to engage in the sexual conduct. The defendant progressively indoctrinated Rebecca to believe sex was a part of her therapy.

Dr. Scott opined that, within a reasonable degree of psychological certainty,

Rebecca was not able to appreciate the nature of her sexual conduct with the defendant as the result of her mental disorders, in that she was unable to discern that she was engaging in sex rather than therapy. Additionally, stated within a reasonable degree of certainty, she was unable to express her unwillingness to participate in the sexual activity. His opinion was the result of the interaction of Rebecca's dependence on the prescription medication with the defendant's manipulation and abuse of the transference and her "very strong personality disorder."

The defendant admitted that the sexual part of his relationship with Rebecca began in November 1993, and that there was some form of sexual contact with her in every session until January 1994. He admitted prescribing various medications for her, and he realized that she was very addicted to Benzodiazpines as early as 1991. He also admitted that he told Rebecca that he would have her hospitalized if she refused to take her medications.

**JEAN**

In February 1988, Jean took her son to the defendant for treatment and was told that her son's problems stemmed from her own. At the defendant's suggestion, she agreed to seek treatment for her son from another doctor elsewhere and that Jean should continue her therapy with him. Over the six years of treatment, the defendant prescribed her Prozac, Trazodone, and Xanax.

Early on in the sessions with Jean, the defendant encouraged open discussion of sexual matters.[5] Over time, the physical, and eventually sexual, contact between them increased during their sessions. In August 1988, the defendant explained that "it was time for us to start the sexual part of our therapy." Jean believed that this was the next step in her treatment. By 1990, the defendant introduced her to "reparenting therapy" or "regression thera-

py." The defendant lead Jean to believe that she had been sexually abused as a small child, probably by her father, although she did not have any recollection of abuse. The defendant engaged in "guided imagery" by which he would hold Jean in his lap and feed her with a baby bottle like a child. Jean would lie on the couch, and the defendant would describe a situation in which her father placed his penis in her month. Eventually, the defendant's penis took the "place of the bottle" during the therapy. Jean testified that the defendant explained to her that "since he was a male and not female, that would be the best that he could offer me, the closest thing to being my mother." He told her that he thought she was suicidal, and that sex would be a way for her to connect with him, and he would become her "lifeline." She testified that she did not believe that she was in a "romantic relationship" with the defendant, but that it was part of the progression of her therapy.

Jean and the defendant had sexual intercourse during her therapy sessions on three occasions in late 1993. On January 1, 1994, at the defendant's office, Jean participated in various sexual acts with the defendant and his 17–year–old stepson. The defendant had intercourse with her once again on January 4, 1994, when the defendant indicated that the sexual part of her therapy was ending. Shortly thereafter, the defendant told her that he had been reported for having sex with another one of his patients (Rebecca). He then went to California, and was admitted to a sexual addiction unit. Jean traveled with the defendant's wife and stepson to visit him in California, when she was also admitted to a psychiatric hospital in California where she again attempted suicide.

Jean's husband testified that his wife did not exhibit any unusual behavior, prior to seeing the defendant, that would suggest she needed psychiatric care. After she

---

5. For example, the defendant told Jean that it was appropriate for her to have sexual fanta- sies about him, and that she should share those fantasies with him.

began therapy with the defendant her condition gradually deteriorated until, in late 1991, she was "very emotionally disturbed." He observed that she gradually believed that her father had sexually abused her as a small child. He noticed that his wife would return from the defendant's office with free samples of Xanax. Two other witnesses also testified that Jean was sicker in 1993 and 1994 than when she began her treatments with the defendant in 1988.

Dr. John Rabun is a certified forensic examiner for the State of Missouri, and a board-certified psychiatrist who evaluates criminal defendants for mental incapacitation pursuant to Chapter 552. Dr. Rabun interviewed Jean and examined her medical records. He testified to the defendant's "subtle indoctrination over a lengthy period of time" of a woman who was depressed and on "medications which were affecting her ability to inhibit her own reactions to the [defendant's] advances." He explained that the defendant used transference to his benefit, so that Jean believed that the sexual conduct was a "prescribed therapy," rather than sex. Dr. Rabun testified that a skillful psychiatrist can manipulate the transference phenomena, and that the defendant did so with Jean. Dr. Rabun testified that he agreed with the following quote that: "The multi-faceted vulnerabilities of the patient create an enormous power differential, raising questions about the ability to give or withhold informed consent to participate in such intimacies. The result in sexually intimate relationships, therefore, take on the aspects of and produces consequences similar to such phenomena as incest and rape." [6]

It was his opinion, within a reasonable degree of medical certainty, that the defendant was able to "brain wash" Jean and that as a consequent, she was not able to appreciate the nature of her behavior. He explained that the defendant "indoctrinated" her to believe that the sexual conduct was a normal process of therapy in the context of her mental illness. Furthermore, it was his opinion, within a reasonable degree of medical certainty, that Jean did not have the capacity to express to the defendant her unwillingness to engage in the sexual conduct.

Dr. Jarvis also interviewed and evaluated Jean. He testified that he found her to be a "very credible person" in the context of his evaluation. He determined that Jean had suffered from depression since as early as eight years of age and that she had attempted suicide as a teenager, but her first mental treatment was with the defendant. During his clinical interview, he described her as very depressed.

Over the six years of her treatment with Dr. Cone, Dr. Jarvis testified that the defendant gained complete control over all aspects of Jean's life, and that she let him make decisions for her in order to keep from feeling worthless. The defendant encouraged Jean to distance herself from her family, so that he was her sole emotional support. Jean attempted suicide several times when she felt that the defendant was rebuking her and was hospitalized several times during the time of her treatment with the defendant. Dr. Jarvis testified that Jean had the emotional age of "a four or five year old child that would do whatever their parents told them to do" and that she had regressed dramatically during the course of her treatment. With regard to Jean's situation, Dr. Jarvis agreed with the following quote that: "When the patient believes that sex is a part of therapy or that it is good for the patient, the patient is too powerless to protest or to question. Also, the transference may cause the patient to view the relationship with a therapist as a lifeline without which he or she cannot exist. If there is no other choice available, if the patient views the relationship as the only hope for sur-

6. Sexual Intimacy Between Therapists & Patients (copyright 1986).

vival, consent is not an issue." [7]

Dr. Jarvis concluded, within a reasonable degree of medical certainty, that Jean was not able to appreciate the nature of her sexual conduct with the defendant because she believed that the sexual contact was part of the treatment necessary to treat her mental difficulties. Additionally, he opined that she was unable to express her unwillingness to act because of her mental illness, and that she had gotten progressively worse over the course of her treatment with the defendant. He acknowledged that she might have been aware that she was engaging in sexual intercourse, however, such knowledge is not dispositive of whether she had the mental capacity to engage in the intercourse in the context of her mental illness.

The defendant testified that, at times, Jean would talk in a different voice and use different names. He did not know whether she was exhibiting a multiple personality or whether it was a "kind of a disassociation." With regard to Jean's mental fitness to engage in sexual relations with him, the defendant testified that "I don't know whether she was fit or not. I do know that the thought never entered my mind to consider whether she was fit or I was fit." With regard to the issue of consent, the defendant testified that "it was my responsibility more than hers." He also agreed that some element of transference existed in his relationship with both women, and he testified that he was impressed with the state's experts in this regard. He admitted that he failed to adequately monitor the drugs he provided to Jean, in that she had the ability to abuse them, and to "stocking her up" on Xanax samples. The defendant listened carefully to Jean's testimony and "found very little of it that [he] disagreed with."

The state also presented the testimony of Rita Marler who scheduled the defendant's psychiatric appointments. Ms. Marler testified that she observed Jean and Rebecca's demeanor change over the course of their treatment with the defendant. Jean became extremely withdrawn, and Rebecca became nervous and her appearance changed drastically. She indicated that she observed both Jean and Rebecca leaving the defendant's office with numerous samples of Xanax and Trazodone. She also testified about a shopping trip that she took with the defendant when he purchased a baby bottle, bib and teddy bear, which he explained he would use in "regression therapy" or "reparenting."

Additionally, a police officer who investigated the matter for the Missouri Attorney General testified about a letter written by the defendant to the editor of the local paper. It was addressed to the people of the community, asking for forgiveness. In the letter, he blamed his conduct on the "addictions to power, work, alcohol and sex," and explained that he suffered from a "form of moral insanity."

**POINT ONE**

■ There was no dispute that the defendant engaged both women in sexual and deviate sexual intercourse. However, the defendant contends that because there was evidence that both women knew that they were engaging in sexual conduct; had weighed the consequences of engaging in such activity; felt guilty about the impact of their actions on others; and were able to communicate their willingness to act on certain occasions; that there was insufficient evidence to prove they were incapacitated because of their mental condition. While conceding that three expert witnesses testified that both women were incapacitated—in that they were unable to appraise the nature of their conduct and were unable to communicate their unwillingness to act—the defendant maintains that their opinion had "no basis in reality and ignore the objective facts." Thus, the question at trial and on appeal is whether the defendant's conduct was criminal in nature because both victims suffered mental conditions so incapacitating that they

7. Sexual Intimacy Between Therapists and Patients (copyright 1986).

were unable to appraise the nature of their conduct or were unable to communicate their unwillingness to engage in such conduct.

First degree sexual assault is defined as:

A person commits the crime of sexual assault in the first degree if he has sexual intercourse with another person to whom he is not married and who is *incapacitated* ...

§ 566.040.1, RSMo 1986. [Emphasis added].

First degree deviate sexual assault is defined as:

A person commits the crime of deviate sexual assault in the first degree if he has deviate sexual intercourse with another person to whom he is not married and who is *incapacitated* ...

§ 566.070, RSMo 1986. [Emphasis added].

Section § 556.061(13), RSMo 1994, defines incapacitated as:

[T]hat physical or mental condition, temporary or permanent, in which a person is unconscious, unable to appraise the nature of his conduct, or unable to communicate unwillingness to an act. A person is not "incapacitated" with respect to an act committed upon him if he became unconscious, unable to appraise the nature of his conduct or unable to communicate unwillingness to an act, after consenting to the act.

The jury was instructed, pursuant to MAI 320.10.1 and MAI 320.04.1, that it must find and believe from the evidence beyond a reasonable doubt that, at the time, the patient was, because of a mental condition, unable to appraise the nature of her conduct or unable to communicate her unwillingness to engage in such conduct. The terms, "unable to appraise the nature of his conduct" and "unable to communicate unwillingness to an act," were discussed in *State v. Buck,* 724 S.W.2d 574 (Mo.App.1986). The court stated that the "issue of whether or not the victim was incapacitated ... turns upon whether [she]

was sufficiently deranged so that she was unable to appraise the nature of her conduct." *Id.* at 575.

In *Buck,* the victim was placed in protective custody after being arrested because of her "bizarre behavior." *Id.* at 564. She was rambling incoherently, insisted on removing her clothing, was combative and acted irrationally. The defendant, who was incarcerated at the same facility, eventually found his way into the victim's cell. He was discovered engaging in sexual intercourse with her and was charged with sexual assault. *Id.* at 575. There was lay testimony describing the victim's bizarre behavior, disordered thoughts and perceptions. *Id.* She was subsequently diagnosed as schizophrenia, paranoid type. *Id.* A resident physician in psychiatry explained that a schizophrenic "has an impaired sense of reality, can't tell what is real and what is not, has a loss of knowledge as to boundaries between themselves and their environment." *Id.* Three physicians opined that the victim was unable to even consent to a review of her own medical records. The court held that there was sufficient evidence to permit the jury's finding that, at the time of the assault, she "did not have the mental capacity to appreciate the nature of her conduct and she was therefore incapacitated." *Id.* at 576.

Our research has also revealed several old cases in which the issue of the victim's consent to sexual activity turned on her mental incapacity. Generally, they stand for the proposition that "weak-mindedness," "unsound mind" or "imbecility of mind," as it related to one's ability to know or comprehend the nature of the act, was a question for the jury to determine. *See State v. Cunningham,* 100 Mo. 382, 12 S.W. 376, 378 (1889); *State v. Williams,* 149 Mo. 496, 51 S.W. 88, 88 (1889); *State v. Warren,* 232 Mo. 185, 134 S.W. 522, 524 (1911); *State v. Schlichter,* 263 Mo. 561, 173 S.W. 1072, 1076 (1915); *State v. Helderle,* 186 S.W. 696, 697 (Mo. banc 1916);

*State v. Robinson,* 345 Mo. 897, 136 S.W.2d 1008, 1009 (1940).

■ "When reviewing the sufficiency of evidence supporting a criminal conviction, the Court does not act as a 'super juror' with veto powers, but gives great deference to the trier of fact." *State v. Chaney,* 967 S.W.2d 47, 52 (Mo. banc 1998)(quoting *State v. Grim,* 854 S.W.2d 403, 414 (Mo. banc 1993)). The *Chaney* court emphasized that great deference be given to the trier of fact by a reviewing court by quoting the United States Supreme Court which said that "this inquiry does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Chaney,* 967 S.W.2d at 52 (quoting *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

It is the jury's job to accept or reject any part of the testimony, and "the effects of conflicts or inconsistencies in testimony are questions for the jury." *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989)(citing *State v. Overkamp,* 646 S.W.2d 733, 737 (Mo.1983); *State v. Pippenger,* 708 S.W.2d 256, 260 (Mo.App.1986)). Therefore, it is "within the jury's province to believe all, some, or none of the witness' testimony in arriving at their verdict," *State v. Dulany,* 781 S.W.2d at 55, and this court does not weigh the evidence presented to the jury, we only assess sufficiency. *State v. Villa–Perez,* 835 S.W.2d 897, 900 (Mo. banc 1992). We are required to view the evidence, together with all reasonable inferences therefrom, in the light most favorable to the verdict. *State v. Feltrop,* 803 S.W.2d 1, 11 (Mo. banc 1991).

The defendant's legal ability to prescribe medicines, his willingness to commit his patients involuntarily to mental institutions, his manipulation of the transference phenomena, as well as his own admitted addiction to power and sex, were all effectively employed to insure the dependency of his patients. In treating both Rebecca's and Jean's mental illness, he prescribed highly addictive psychotropic medications, which he utilized for his own purposes by either withholding or dispensing them not for the benefit of the patient, but rather for his own purposes. Additionally, there were implied threats of physical harm and frequent threatened and actual involuntary commitments in order to insure his patients' "good behavior." The use of these various devices made both women reliant on him for their emotional well being. The result of his manipulations, according to the medical experts, reduced both women to an emotional age of a small child, with regard to their appreciation of their sexual actions. Moreover, there was objective lay evidence that graphically described the deterioration of both women to a deeper sickness as the "treatment plan" progressed. The evidence presented supports the conclusion that the defendant's "treatment plan" had as its purpose to bring both women under his control and to not help his patients. The victims' dependency on the doctor and his "treatment plan" rendered them unable to appreciate the nature of their conduct or the reality of their "decisions."

The state presented three medical experts who testified that the defendant used his position as a psychiatrist to convince the women that the sexual conduct was part of their treatment and concluding that they did not have the mental capacity to refuse. With regard to Rebecca, Dr. Jarvis' opinion was that she was not able to appreciate the nature of her sexual conduct with the defendant because of her mental illness and her belief that the conduct was part of her treatment. Within the context of her relationship with the defendant, he described her emotional age as that of a small child. Additionally, Dr. Scott explained how Rebecca's personality disorder, coupled with the supply of prescription drugs and the explanation that

the sexual contact would be therapeutic, prevented her from understanding the nature of her conduct. He testified that she was manipulated into the sexual contact in the form of the "reparenting" therapy, and that he did not "believe that she was competent to consent."

As to Jean, Dr. Jarvis testified that the defendant had "complete control" over all aspects of Jean's life, and that she had the emotional age of "a four or five year old child." He testified that he believed that Jean was not able to appreciate the nature of her sexual conduct with the defendant because she believed, in the context of her illness and the defendant's treatment of her, that such conduct was treatment of her depression and personality difficulties. Dr. Rabun testified that Jean believed that the sexual conduct was "a prescribed therapy" in the context of reparenting and, therefore, she could not appreciate the sexual nature of her behavior.

While there was some contrary evidence that the women understood the nature of their actions, there was substantial evidence from which a jury could find that that they did not appreciate the nature of their conduct in committing sexual acts with the defendant.[8] It was for the jury to assess the disparate evidence of the women's incapacitation because of their inability to apprise the nature of their conduct and any evidence of voluntary consent. *State v. Dighera*, 617 S.W.2d 524, 532 (Mo.App.1981). There was sufficient evidence for the jurors to conclude that the victims were unable to understand that their conduct was sexual in nature—instead believing that it was conduct necessary to further their treatment for their mental illnesses—and, as such, that they were mentally incapacitated under the definition in § 556.061(13). Point denied.

---

8. The state argues that the evidence also supports a jury determination that the women could not communicate their unwillingness to act. It argues that Jean did not even think to communicate her unwillingness to act, and was unable to do so once she was under the influence of the Benzodiazepines. Similarly, the state contends that Rebecca could not communicate her unwillingness, in the context of her psychiatric illnesses, under the threat of involuntary commitment and the withholding of her medications. We do not reach this issue.

## POINT TWO

■ In his second point, the defendant argues that the trial court erred in overruling his objections to the expert testimony that Jean and Rebecca were credible people. He claims that Dr. Jarvis' and Dr. Rabun's testimony that the victims were credible "usurped the province of the jury and unfairly tipped the scales against the defendant." The state responds that the questioning did not concern the credibility of the victims as witnesses. Rather, it maintains that the evidence was related to the credibility of the information relied upon by the experts—as related by the victims during their evaluation interviews—in reaching their conclusions as to the victims' mental incapacity.

The defendant challenges the following testimony proffered by Dr. Jarvis with regard to his evaluation of Rebecca:

Q. During the course of your years as a treating psychiatrist, are you trained and do you engage in credibility evaluations when you are performing an evaluation on somebody?

A. A good diagnosis and understanding always requires that we try to make a determination of whether what the person is telling us is valid, or true. ... often they may tell us what they think to be true, but their perspective is distorted based on emotional or mental illness, and often what they tell us isn't completely true; it's kind of warped in a way. So we have to get a sense of that as well.

Q. And did you engage in that type of credibility analysis during the course of your evaluation of [Rebecca]?

A. Yes, I did.

Q. Were you at any time under the impression that she was exaggerating or lying for some ulterior motive that she did not tell you about?

[Defense counsel objected on the basis that the question "calls for opinion or conclusion or speculation that he would really have no expertise on." The objection was overruled.]

A. Much of what I have to do ... is assess people for malingering. And what we look for in those cases is, is their story internally consistent, does it make sense from one part of the story to the other, does it fit the facts we have available from outside sources, does what they are telling us about what is wrong with them fit with what we know about the nature of the illness. And [Rebecca's] report passed all of those tests.

With regard to Jean, Dr. Jarvis' challenged testimony was as follows:

Q. How about her credibility? Did you evaluate her credibility when you were performing your evaluation of her?

A. Yes. I found her to be a very credible person.

Additionally, the defendant complains of the following testimony from Dr. Rabun about his examination of Jean:

Q. ... [I]n engaging in the evaluation of [Jean,] did you make any judgments relative to her credibility when evaluating her?

A. Yes.

[Defense counsel again objected, stating that he did not "think it's within his expertise to judge her credibility. And it does invade the province of the Court and the jury." The objection was overruled.]

Q. What conclusion did you come to relative to the credibility of [Jean]?

A. Actually we don't use the word "credibility," but whether or not someone is malingering, or faking, or feigning ... In fact, that's a very important part of forensic psychiatry, to make sure a defendant, usually, but it can be a victim as well, is not exaggerating, feigning, or faking symptoms. And there was no indication from my evaluation that [Jean] was in any way exaggerating or feigning or faking symptoms or making up information.

■ We agree with the defendant's assessment that a witness' credibility is best left to "the general realm of common experience of members of a jury and can be evaluated without an expert's assistance." *State v. Lawhorn,* 762 S.W.2d 820, 823 (Mo. banc 1988). However, the "credibility" to which the doctors spoke was the consistency and reliability of their statements to the doctors, not their court testimony.[9] In support of defendant's position, he cites the rule in Missouri that expert testimony is not admissible "unless it is clear that the jurors are not capable, for want of experience or knowledge of the subject, to draw correct conclusions from the facts provided." *State v. Taylor,* 663 S.W.2d 235, 239 (Mo. banc 1984)(ruling that an expert's opinion that the victim suffered from rape trauma syndrome "vouched too much for the victim's credibility" as it related to her claim that she did not consent). Missouri "strictly prohibits expert evidence on witness credibility." *State v. Williams,* 858 S.W.2d 796, 800 (Mo.App.1993)(regarding an expert's opinion that children who have been sexually abused "rarely lie").

Dr. Jarvis explained that, in order to obtain a good diagnosis and understanding of the patient's condition, the examiner is required to determine whether the patient is telling the examiner valid information.

---

**9.** A fine distinction to be sure, but no more onerous for a jury to discern than understanding the difference between a witness' hearsay testimony as to its truthfulness or for another purpose. As with this distinction, a party is entitled to a court instruction noting the limitation of the evidence.

It may be that the patient tells the doctor what she thinks to be true, but her perspective may be distorted based on emotional or mental illness. The examiner must determine whether the patient's account fits with what the examiner knows about the nature of the illness. Also, the doctor must establish whether the patient is malingering. These determinations, according to the psychiatrist, are made on a daily basis in the course of establishing the diagnosis.

The contested issue in this case was whether the women were mentally incapacitated at the time of the sexual contacts. As discussed *supra*, the defendant essentially agreed with the victims' versions of the events, as well as with the course and progression of their sexual contact with the defendant. The defendant points us to only two minor inconsistencies between his testimony and that of the women. There was never a claim that the sexual contact did not occur. As a result, the credibility of Rebecca's and Jean's testimony, as it related to their testimony regarding the sexual conduct, was not contested. Instead, the jury was called upon to determine whether the women were incapacitated. In that respect, the experts' testimony regarding the credibility of the women's statements to them was permissible in order to allow the experts to establish a basis for their diagnoses and opinions.

 "An expert witness may be cross-examined about facts not in evidence to test the validity of his opinion. ... Prosecutors have wide latitude in cross-examining psychological experts because the factual basis for psychiatric testimony is particularly important." *State v. Parker*, 886 S.W.2d 908, 927 (Mo. banc 1994)(citing *State v. Goree*, 762 S.W.2d 20, 23 (Mo. banc 1988); *State v. Darnell*, 858 S.W.2d 739, 747 (Mo.App.1993)). "A physician testifying as to a patient's health may be asked, like any other witness, for the reasons for his conclusions—either on direct examination, to show his opinion

well founded ... or on cross-examination, to show it ill founded." *State v. Gary*, 913 S.W.2d 822, 830 (Mo.App.1995)(quoting 6 Wigmore, Evidence § 1720(1)(Chadbourn rev.1976))(reversed on other grounds). *See also State v. Barnes*, 740 S.W.2d 340, 343 (Mo.App.1987)(allowing a state psychiatric expert to testify as to the defendant's out-of-court statements for the purpose of providing a foundation for the expert's diagnosis that the defendant was malingering in an assessment interview for mental disease or defect).

Phrasing the question in the context of the women's credibility, as was done here, is not recommended as it tends to confuse the jury's role in deciding credibility. However, two of the experts explained that they did not view their evaluation in terms of "credibility," but rather explained that they must determine for their analysis whether the patient is "malingering or faking or feigning" in the context of forming their diagnosis and opinion. There is a difference, subtle though it may be, between the psychiatric evaluations of the statements made to them and stating an opinion about the credibility of the witnesses' court testimony. The first is necessary to establish a firm factual basis for the proffered opinion and, therefore, a critical part of the experts' evaluation. The latter violates a firmly entrenched rule of evidence prohibiting comment on the credibility of witnesses' testimony by an expert. Therefore, the witnesses who explained the purpose of their evaluation cured error, if any, caused by asking the question in terms of credibility.

 "The admissibility of expert testimony is left to the sound discretion of the trial court and will not be reversed on appeal unless there is a clear abuse of discretion." *State v. Love*, 963 S.W.2d 236, 239–40 (Mo.App.1997)(citing *State v. Davis*, 814 S.W.2d 593, 603 (Mo. banc 1991)). This discretion is abused only when the ruling is clearly against the logic of the circumstances, or when it is arbi-

trary and unreasonable. *State v. Love,* 963 S.W.2d at 240. Point denied.

Judgment affirmed.

SMART, P.J., and LAURA DENVIR STITH, J., concur.